NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11757


       BERNARD SEBAGO & others[1]  vs.  BOSTON CAB DISPATCH, INC.,
              & others[2] (and a consolidated case[3]).



          Suffolk.     January 8, 2015. - April 21, 2015.

  Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Hines,
                              JJ.



Taxicab.  Independent Contractor Act.  Massachusetts Wage Act.
     Minimum Wage.  Tips.  Labor, Wages, Minimum wage, Overtime
     compensation.



       Civil actions commenced in the Superior Court Department on
March 6 and September 14, 2012.

       After consolidation, the case was heard by Linda E. Giles,
J., on motions for summary judgment, and the case was reported
by her to the Appeals Court.

       The Supreme Judicial Court granted an application for
direct appellate review.



          [1] Pierre Duchemin and Ahmed Farah.  The plaintiffs sued
individually and on behalf of all others similarly situated.

          [2] USA Taxi Association, Inc.; Independent Taxi Owners
Association; George Summers; and John Byda.

          [3] Ahmed Farah & another vs. Edward J. Tutunjian & another.

Shannon Liss-Riordan (Adelaide Pagano with her) for Bernard Sebago.

Andrew Good (Philip G. Cormier with him) for Edward J. Tutunjian.

Albert A. DeNapoli (Emily C. Shanahan with him) for USA Taxi Association, Inc.

Nathan L. Kaitz, for John Byda, was present but did not argue.

The following submitted briefs for amici curiae:

Norman M. Leon, of Illinois, & Matthew Iverson for International Franchise Association.

Nicole Horberg Decter & Don Siegel for Massachusetts AFL-CIO.

Stevan Johnson, pro se.

Helen G. Litsas, Special Assistant Corporation Counsel, for city of Boston.


CORDY, J.  In this case, we must determine whether licensed taxicab drivers in the city of Boston (city) may be classified properly as independent contractors, see G. L. c. 149, § 148B (independent contractor statute), in accordance with Boston Police Department Rule 403, Hackney Carriage Rules and Flat Rate Handbook (2008) (Rule 403).  Rule 403 is a comprehensive set of regulations for the Boston taxicab industry, promulgated by the city's police commissioner (commissioner) pursuant to an express delegation of authority by the Legislature.  St. 1930, c. 392, as amended by St. 1931, c. 408, § 7, and St. 1934, c. 280.

The plaintiffs in these consolidated cases, Bernard Sebago, Pierre Duchemin, Ahmed Farah, and Yves Bien-Aime, are licensed taxicab drivers in the city.  They contend that they were employees of the defendants but were misclassified as independent contractors, thereby depriving them of minimum

wages, overtime pay, tips, and the protections afforded by the Wage Act, G. L. c. 149, § 148.  The defendants include taxicab owners, radio associations, and a taxicab garage.  They argue that their relationships with the plaintiffs must be considered in the context of Rule 403, which explicitly permits drivers to operate as independent contractors.  The plaintiffs reply that a municipal regulation cannot override the State's independent contractor statute.

We read Rule 403 and the independent contractor statute in harmony and conclude that the plaintiffs were not employees of the defendants.  Rule 403 neither precludes taxicab owners from entering into employer-employee relationships with drivers nor recasts drivers as independent contractors where they would otherwise be considered employees.  Rather, Rule 403 creates a regulatory regime over an industry in which taxicab owners, radio associations, and drivers may operate as separate businesses.  Given the Legislature's broad grant of authority to the commissioner, we cannot say that Rule 403 is contrary to the policies undergirding the independent contractor statute.[4]

1.  Background.  In 1930, the Legislature granted the commissioner the exclusive authority to regulate the city's taxicab industry.  St. 1930, c. 392, § 1 ("police commissioner

---

[4] We acknowledge the amicus briefs submitted by the city of Boston (city), the International Franchise Association, the Massachusetts AFL-CIO, and Stevan Johnson.

of the city of Boston shall have exclusive authority to make rules and orders for the regulation of hackney carriages and hackney stands").  In 2008, acting pursuant to that mandate, the commissioner promulgated Rule 403, creating a comprehensive system of rules and regulations governing the ownership, leasing, licensing, rate setting, and operation of taxicabs in the city.  Rule 403, § 1(II).  We summarize how the taxicab industry is designed to operate under Rule 403, reserving certain details for the issues raised on appeal.

Rule 403 defines what it means to be a Boston taxicab.  In order to qualify, a vehicle must, among other things, be "outfitted with an approved Protective Partition dividing the driver's and passenger's seats"; be "outfitted with an approved taximeter"; be "enrolled in a Radio Association and painted with the approved Radio Association colors and markings"; "display the current fare rate cards on the inside of the vehicle, in clear view of the passengers"; display "lease/shift rate stickers . . . in clear view of the Driver"; "be equipped with an electronic credit card processing capability"; and "be equipped with two-way communication linked to an approved dispatch service or radio association."  Rule 403, §§ 3(III)(C), 7(I)(a).

In order for a qualifying taxicab to be put into service, the owner must obtain a license, called a "medallion," for each

such taxicab.  Rule 403, § 3(III)(c)(ix).  Rule 403 sets forth a myriad of requirements that must be met in order to qualify for a medallion, including being deemed "suitable" individuals by the city's inspector of carriages, obtaining adequate garage facilities within the city, and maintaining membership in an approved "dispatch service or radio association, which provides twenty-four (24) hour two-way communication solely, and exclusively, for Boston [taxicabs]."  Rule 403, § 4(II)(a), (l), (q).

The radio associations, in turn, are required to provide certain enumerated dispatch services to their members and may accept payment for those services only from medallion owners. Rule 403 imposes strict operational standards on the radio associations, ranging from record-keeping and financial reporting requirements to city approval of the association's colors and designs that are painted on their members' taxicabs. A radio association's failure to comply with Rule 403 is cause for its immediate removal from the commissioner's list of approved dispatchers, in which case, medallion owners have thirty days to enroll in a different radio association.  Rule 403, § 7.

Drivers are likewise subject to a distinct set of requirements under Rule 403, including training supervised by the city's inspector of carriages, obtaining taxicab driver

licenses, and complying with numerous operational rules ranging from personal appearance to treatment of passengers. The procedures set forth in Rule 403 for picking up passengers at public taxi stands are highly specific, instructing drivers, inter alia, how to line up ("Take proper position in rear of the Hackney Carriage line"); what activities they may engage in while waiting in line ("Driver may perform small cleaning tasks while on a public stand"); and how they may solicit passengers ("from inside the vehicle by motion of the hand"). Rule 403, § 5(II)(u). The fares that they collect from passengers are determined by meter and flat rates set by the commissioner and specified in Rule 403. See Rule 403, § 10. In sum, businesses operating under the regime of Rule 403 may be described aptly as members of a highly regulated industry.

Rule 403 contemplates four business models under which a taxicab may be put into service: (1) the "owner-operator" model, whereby a medallion owner with a qualifying taxicab transports customers in exchange for fares and tips, Rule 403, § 3(I)(f); (2) the "leased" model, whereby a medallion owner leases a medallion to a taxicab owner, who then operates the medallioned taxicab, Rule 403, § 3(I)(g); (3) the "shifted" model, whereby a medallion owner leases both a medallion and a taxicab to a driver to operate for a "shift," which is typically twelve hours in duration, Rule 403, § 4(I)(c); and (4) the

"managed" model, whereby a medallion owner leases medallions to a "manager," who then subleases medallions and taxicabs to drivers for shifts.  Rule 403, § 4(I)(a), (b).  Rule 403 neither expressly permits nor prohibits a model in which drivers operate as employees of medallion owners, radio associations, or taxicab garages.

The defendants in these cases include medallion owners, radio associations, and a taxicab garage.  Edward Tutunjian, John Byda, and George Summers each own corporations that, in turn, own and lease varying quantities of taxicabs and medallions (collectively, medallion owners).[5]  Tutunjian also owns Boston Cab Dispatch, Inc. (Boston Cab), which is one of the seven radio associations authorized by Rule 403.  Summers and Byda each are members of the unincorporated Independent Taxi Owners Association (Independent Taxi), another of the radio associations authorized by Rule 403.  In addition, Summers owns USA Taxi Association, Inc. (USA Taxi), which operates a garage that services taxicabs and taxicab equipment.

The plaintiffs are licensed taxicab drivers who leased taxicabs and medallions from the medallion owners at flat rates,

---

[5] Edward Tutunjian owns corporations that, in turn, own 372 taxicabs and medallions.  Another of Tutunjian's companies, EJT Management, Inc. (EJT), manages the leasing of Tutunjian's taxicabs and medallions.  Byda owns corporations that, in turn, own and lease nine taxicabs and medallions.  Summers owns corporations that, in turn, own and lease seventeen taxicabs and medallions.

which are set by the commissioner and specified in Rule 403.
See Rule 403, § 6; Rule 403, Appendix III.  The taxicabs they
leased received dispatch services from either Boston Cab or
Independent Taxi, which the plaintiffs were entitled, but not
required, to use in the course of transporting customers for
fares and tips.  Where, as here, drivers lease their taxicabs
and medallions, Rule 403 requires the parties to use the City of
Boston Hackney Carriage Shift Lease Agreement 2010 Version
(2009), which sets forth the rights and obligations of the
lessor and lessee, the duration of the lease, and the applicable
flat lease rate.  See Rule 403, § 6.  The agreement also
includes an optional "Independent Contractor" clause, which
states, inter alia, that the lessee is free from the control of
the lessor and is not required to remit to the lessor any funds
received in connection with the taxicab's operation.[6]  The lease

---

[6] The clause states in full:

"The Lessee specifically acknowledges that he is an
independent contractor and the Lessor and Lessee are
separate entities.  This Agreement shall not be construed
to form a partnership, limited partnership, general
partnership, joint venture, principal agent or
employee/employer relationship of any kind whatsoever.
Neither the Lessor nor the Lessee shall have any power to
obligate or bind the other.  Lessee shall at all times be
free from control or direction of the Lessor in the manner
of operation of the Hackney Carriage.  The Lessee shall not
be required to accept any radio dispatch call other than
those which it may be his volition to accept; and further,
Lessee shall not be restricted in any manner as to the area
in which he may operate said Hackney Carriage, nor shall he

agreements between the plaintiffs and defendant medallion owners include this clause.

In 2012, the plaintiffs filed their complaints in the Superior Court, alleging that the defendants improperly classified them as independent contractors and, concomitantly, violated G. L. c. 149, § 148 (Wage Act); G. L. c. 151, §§ 1, 7 (minimum wage law); G. L. c. 151, § 1A (overtime law); and G. L. c. 149, § 152A (tips law).[7]  After the two actions were consolidated, the plaintiffs and some of the defendants filed cross motions for summary judgment, the focus of which were on count one of each of the complaints, misclassification as independent contractors.  A Superior Court judge concluded that

be required to remain in any specific place, as long as he adheres to the laws and ordinances of the municipality in which said vehicle may be operated and the rules and regulations governing Hackney Carriages. Lessee shall not be required to account to the Lessor in any manner for the fares or other amounts received by the Lessee in connection with the operation of said Hackney Carriage, except will turn over to the Lessor at the end of the rental period any records required to be kept by any laws, ordinances or regulations pertaining to the operation of the Hackney Carriage.

"The Lessor and Lessee specifically acknowledge that the inclusion of this optional clause in the Agreement does not indicate or imply any endorsement, approval or judgment as to the legal standing of the clause by the City of Boston, the Police Commissioner or the Hackney Unit."

City of Boston Hackney Carriage Shift Lease Agreement 2010 Version (2009).

[7] The city was also named as a defendant in one case, but was subsequently dismissed.

the plaintiffs provided a "service" to the defendants within the meaning of the independent contractor statute, but denied summary judgment after determining that genuine issues of material fact existed as to whether the provision of taxi services was within the usual course of the defendants' businesses. The judge reported her decision to the Appeals Court, and we granted the parties' joint application for direct appellate review.

2. Discussion. a. Application of the independent contractor statute to the Boston taxicab industry. The independent contractor statute "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of our wage statutes." Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009). Under this standard, "'an individual performing any service' is presumed to be an employee." Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 621 (2013), quoting G. L. c. 149, § 148B (a). The purported employer may rebut the presumption of employment by establishing the following three indicia of an independent contractor relationship:

> "(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

"(2) the service is performed outside the usual course of the business of the employer; and

"(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

G. L. c. 149, § 148B.  The failure to satisfy any prong will result in the individual's classification as an employee. "Individuals who provide services to an employer as an employee (rather than as an independent contractor) fall within the protection of the wage act and G. L. c. 151, § 1A (overtime)." Somers, supra at 589.

The defendants argue that the independent contractor statute does not apply to the taxicab industry, because the industry is separately regulated by the city as a public utility.  We disagree.  The enabling legislation for Rule 403 is not so broad as to give the commissioner the authority to override the independent contractor statute.  See St. 1930, c. 392.  See also Boston Gas Co. v. Somerville, 420 Mass. 702, 703 (1995) ("Municipalities may not adopt by-laws or ordinances that are inconsistent with State laws").  Further, we have held that the independent contractor statute must be applied in a manner that is consistent with its underlying purpose, which is "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees."

*Depianti*, 465 Mass. at 620, quoting *Taylor* v. *Eastern Connection Operating, Inc*., 465 Mass. 191, 198 (2013).

It is instructive that the workers' compensation law expressly excludes taxicab drivers operating on flat-rate leases from the definition of "employee," whereas the independent contractor statute is silent on the subject. See G. L. c. 152, § 1 (4). From this silence, we infer that the Legislature intended the criteria for identifying independent contractors to be applied in the context of the taxicab industry. See *Depianti*, 465 Mass. at 620, quoting *Batchelder* v. *Allied Stores Corp*., 393 Mass. 819, 822 (1985) ("remedial statutes such as the independent contractor statute are 'entitled to liberal construction'"). See also *Roberts* v. *Enterprise Rent-A-Car Co. of Boston, Inc*., 438 Mass. 187, 192-193 (2002) ("Had the Legislature intended to require that the notice appear in a *particular* location, it could have done so easily, as it has elsewhere in the General Laws . . . . The Legislature's silence on the subject cannot be ignored").

Nonetheless, the plaintiffs err in characterizing the defendants as a singular employer exercising monolithic control over the taxicab industry. Disregard of the corporate form requires an analysis of the following factors:

> "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of

corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."

Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 n.19 (2000). Although there is common ownership among some of the defendants, "[t]he mere fact of common management and shareholders among related corporate entities has repeatedly been held not to establish, as a matter of law, a partnership, agency or 'joint venture' relationship that renders the corporations a 'single employer.'" Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 624 (1990).

The Depianti case is not to the contrary. In Depianti, we held that an employer could not perform an "end run" around the Wage Act "by virtue of an arrangement permitting it to distance itself from its employees." Depianti, 465 Mass. at 621, 624. Yet, the reported question in that case was premised on the assumption that the workers were employees, prompting us to caution that "the statute has no application where the parties have neither an independent contractor nor an employment relationship." Id. at 624 n.17. Depianti does not stand for the proposition that any connection between entities is sufficient to render them joint employers. Rather, Depianti holds that if, for example, the plaintiffs in the present cases

were found to be employees of EJT Management, Inc. (the entity with which they contracted), the lack of a contract between the plaintiffs and Tutunjian would not shield Tutunjian from potential misclassification liability.  Id. at 624-625 & n.17.

Where, as here, the plaintiffs' allegations are limited to common ownership and control, there is no cause to analyze the defendants as a single employer.  See Middlesex Retirement Sys., LLC v. Assessors of Billerica, 453 Mass. 495, 503 (2009); Gurry, 406 Mass. at 624.  The correct approach in these cases is to consider each defendant's relationship with the plaintiffs separately, although, for ease of analysis, we group the defendants as owners and lessors of taxicabs and medallions (collectively, "medallion owners"); radio associations; and a taxicab garage.[8]  We now turn to whether the plaintiffs provided services to the defendants in any of these groups and, if so, whether the recipients of those services misclassified the plaintiffs as independent contractors.

b.  Provision of services.  The threshold question is whether the plaintiffs provided services to the defendants.  The motion judge concluded that the drivers provided a service

---

[8] It is important to keep in mind that if liability were to attach to one of the corporate defendants, the "president and treasurer of [the] corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of [§ 148B]."  G. L. c. 149, § 148B (d).  However, this is distinct from the analysis whether a medallion owning entity and a radio association are alter egos of each other.

because, without the drivers' work, the owners' medallions and taxicabs would be worthless. The judge's reasoning, adopted by the plaintiffs on appeal, proves too much. "[O]ur respect for the Legislature's considered judgment dictates that we interpret the statute to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation." DiFiore v. American Airlines, Inc., 454 Mass. 486, 490-491 (2009). Certainly, the parties' characterization of their relationship as lessor-lessee, rather than employer-employee, is not controlling. See Commonwealth v. Weinfield's, Inc., 305 Mass. 108, 111 (1940) ("A consideration of the lease and the agreed facts leads to the conclusion that the relationship . . . was that of employer and employee"). However, companies spanning a vast array of industries commonly elect to lease, rather than purchase, equipment that is necessary to their business operations. Absent some controlling principles, all lessees would be deemed presumptive employees of their lessors.

In search of a controlling principle, the plaintiffs cite several cases involving adult entertainment entities that purport to lease performance space to dancers.[9] Those cases are

---

[9] See, e.g., Monteiro vs. PJD Entertainment of Worcester, Inc., Super. Ct., No. 10-1930 (Worcester County Nov. 23, 2011); Jenks vs. D. & B. Corp., Super. Ct., No. 09-1978 (Essex County

not applicable here.  This is not a case of defendants concocting an artificial leasing scheme to circumvent the wage laws.  Contrast Weinfield's, Inc., 305 Mass. at 111 ("unusual method adopted in the lease is significant").  This is also not a case of owners creating a false dichotomy between the administrative and operational aspects of their business.  Contrast Massachusetts Delivery Ass'n v. Coakley, 769 F.3d 11, 14, 21 n.4 (1st Cir. 2014) ("[C]ouriers deliver packages for delivery companies.  There can be no dispute that they act in the course of business for the delivery companies, even if one performs the deliveries and the other arranges the deliveries").  It is significant that the commissioner, rather than the defendants, created the leasing system at issue and, further, that the system was created in the context of a legislative mandate to regulate the taxicab industry.  See Arbella Mut. Ins. Co. v. Commissioner of Ins., 456 Mass. 66, 77 (2010) ("we will not declare the regulations void unless no reasonable construction of them is in harmony with the legislative mandate").  We cannot say that the creation of a tightly controlled taxicab leasing system was an unreasonable method of regulating the taxicab industry.  Cf. Hingham Healthcare Ltd. Partnership v. Division of Health Care Fin. & Policy, 439 Mass.

---

Aug. 24, 2011); Chaves vs. King Arthur's Lounge, Super. Ct., No. 07-2505 (Suffolk County July 30, 2009).

643, 651 n.9 (2003) ("defendant was following a legislative mandate to control reimbursement in an important, and highly regulated, industry. Nothing the defendant has done is in violation of the statutorily conferred power of G. L. c. 118G, and thus the 1998 and 2000 amendments may be deemed reasonable and necessary actions by the defendant"). Mere participation in that system is insufficient to render medallion owners the presumptive employers of the drivers who lease their taxicabs. See Parks Cab Co. v. Annunzio, 412 Ill. 549, 553 (1952) (defendant's business was "leasing of taxicab licenses, and in that business the drivers render no services for it").

It may be argued that there is a genuine issue of material fact as to whether the plaintiffs provided services to the medallion owners beyond the mere operation of their lessor-lessee relationship. The summary judgment record is opaque, for example, regarding the extent to which medallion owners sold advertising space on their taxicabs and, further, the extent to which the plaintiffs drove taxicabs depicting those advertisements. Although the plaintiffs were free to use leased taxicabs for purposes entirely unrelated to the transportation of passengers, their use of the taxicabs arguably could constitute a service to the owners insofar as it increased the value and facilitated the sale of advertising space. However, as we explain below, even if the plaintiffs did, in fact,

provide the medallion owners with some form of service in this respect, the owners satisfy all three prongs of the independent contractor test.

With respect to the radio associations, it is noteworthy that they maintain voucher accounts with corporate clients. Vouchers from such clients are submitted to the taxicab drivers as payment for fares and tips. The voucher may then be redeemed through the radio association, which advances an amount equal to the fare and tip, minus a "processing" fee, which Rule 403 caps at eight per cent of the fare. Rule 403, § 7(I)(l). The revenue flowing to the radio association through the voucher program is directly dependent on the drivers' work of transporting passengers. Although the plaintiffs were not required to perform services for the radio associations, that is precisely what they did. Consequently, the independent contractor test must be applied to determine whether the plaintiffs are employees of the radio associations.

In contrast, the plaintiffs clearly do not provide services to taxicab garages. USA Taxi owns neither a taxicab nor a medallion. It does not lease taxicabs, maintain corporate voucher accounts, or belong to a radio dispatch association. Rather, it operates a garage that caters to the taxicab industry as a whole. USA Taxi's revenues derive largely from setting up and servicing taxicabs belonging not only to Summers, but other

medallion owners as well.  USA Taxi generates additional revenue from credit card companies for repairs made to credit card machines installed in taxicabs.  The fact that Summers owns USA Taxi is not, in itself, of legal significance.  See Middlesex Retirement Sys., LLC, 453 Mass. at 503.  Irrespective of the services that USA Taxi allegedly provided to Summers, the record is clear that the plaintiffs did not provide services to USA Taxi.  Summary judgment on count one should have been rendered against the plaintiffs with respect to USA Taxi.  Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).

Still to be addressed, however, is the application of the independent contractor test to the medallion owners and radio associations.  We address each prong in turn.

c.  Freedom from control and direction.  The first prong asks whether the drivers were "free from control and direction in connection with the performance of the service," i.e., the transportation of passengers in exchange for fares and tips. G. L. c. 149, § 148B (a) (1).  The Attorney General has advised that this inquiry turns on whether the "worker's activities and duties [were] actually . . . carried out with minimal instruction.  For example, an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job." Advisory 2008/1, Attorney General's fair labor and business

division. "Insofar as the Attorney General's office is the department charged with enforcing the wage and hour laws, its interpretation of the protections provided thereunder is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions." Smith v. Winter Place LLC, 447 Mass. 363, 367-368 (2006).

Drivers receive minimal direction from medallion owners or radio associations. The drivers choose the shifts they work and are free to transport as many or as few passengers as they wish during those shifts. Although Rule 403 allows a radio association to discontinue its services to a driver if the driver accepts dispatches and fails to complete them, the driver remains free to operate his or her business of picking up passengers in exchange for fares and tips. The driver is also free to lease from a different medallion owner, who, in turn, may provide the driver with access to a different radio association. Drivers may decline to accept dispatches altogether and, indeed, one of the plaintiffs in this case testified that he has never logged in to receive dispatches from a radio association. Another plaintiff testified that he used leased taxicabs to attend classes and drive to volunteer jobs. See Commissioner of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. 426, 430 (2007)

(taxicab drivers free from control and direction where they had freedom of choosing which shifts to work, were not obligated to respond to dispatches, and were free to engage in other employment and perform personal business using taxicabs).

The driver's appearance, cellular telephone usage, ability to smoke, procedures for obtaining or refusing passengers, standards for the treatment of passengers, meter rates, and geographical areas of operation are all governed by Rule 403. Rule 403, §§ 5, 10.  When a passenger leaves property behind in the taxicab, the driver is required to deliver it, not to the medallion owner or radio association, but to Boston police headquarters or the hackney carriage unit.  Rule 403, § 5(II)(2).  Further, the leases they signed, while not dispositive, are additional evidence that the plaintiffs were generally free from the control and direction of the medallion owners and radio associations.  See City of Boston Hackney Carriage Shift Lease Agreement 2010 Version, supra.  The defendants have carried their burden under the first prong.

d.  Performance outside the usual course of the employer's business.  The second prong represents the core of the parties' dispute.  This prong is satisfied if the drivers' services are "outside the usual course of the business of the employer." G. L. c. 149, § 148B (a) (2).  We have recognized that a purported employer's own definition of its business is

indicative of the usual course of that business.  See <u>Athol Daily News</u> v. <u>Board of Review of the Div. of Employment & Training</u>, 439 Mass. 171, 179 (2003).  Another factor is "whether the service the individual is performing is necessary to the business of the employing unit or merely incidental."  Advisory 2008/1, <u>supra</u>.  The Attorney General has suggested that interpretations of the Illinois independent contractor statute are instructive of the distinction between necessary and incidental services.  <u>Id</u>.  We agree.[10]

In <u>Parks Cab Co</u>., 412 Ill. at 549, taxicab drivers paid flat fees to lease taxicab medallions.  The court observed that the lessor was "not concerned with the operation of the cabs or the results of their operation . . . .  Its business is the leasing of taxicab [medallions], and in that business the drivers render no services for it."  <u>Id</u>. at 553.  In contrast, the drivers in <u>O'Hare-Midway Limousine Serv., Inc</u>. v. <u>Baker</u>, 232 Ill. App. 3d 108, 111 (1992), leased limousines and transported customers for fares, but were required to remit a percentage of those fares to the lessors.  The court recognized:

> "[The] <u>Parks</u> cab drivers are readily distinguishable from the chauffeurs in the case at bar.  While the cab drivers

---

[10] But see <u>Athol Daily News</u> v. <u>Board of Review of the Div. of Employment & Training</u>, 439 Mass. 171, 179 n.11 (2003) ("To the extent that language employed by the Illinois court suggests that a newspaper delivery route is a newspaper company's place of business for purposes of G. L. c. 151A, we respectfully disagree").

> were free to pick up passengers wherever they chose, [the chauffeurs] picked up customers who had 'booked' limousine services with [the employer]. While the cab drivers paid a set weekly rate for their leases, [the chauffeurs] paid a percentage of their commissions to [the employer], thus establishing a financial interdependence, or a direct financial stake with the limousine company."

Id. In Carpetland U.S.A., Inc. v. Illinois Dep't of Employment Sec., 201 Ill. 2d 351, 386 (2002), the Supreme Court of Illinois cited O'Hare-Midway, supra at 113, as an exemplar of the distinction between incidental and necessary services.

The present case hews much closer to Parks Cab than to O'Hare-Midway, for the medallion owners' leasing business is not directly dependent on the success of the drivers' endeavors. The medallion owners are not concerned with the results of the plaintiffs' operations, as drivers are not required to remit a percentage of their revenues, which include both fares and tips.[11]  Cf. Whitehouse v. Cities Serv. Oil Co., 315 Mass. 108, 111-112 (1943) ("[The distributor] conducted its own business, selling to its own customers and receiving as its only

---

[11] Rule 403 permits medallion owners to recover from drivers the credit card transaction fee charged to them by credit card companies. As Rule 403 requires drivers to accept credit card payments, the processing fee is simply a cost of doing business. The fact that the fee is channeled through the medallion owners does not render the leasing business dependent on the success of the drivers' transportation business. It also bears noting that if "the owner chooses a source for the [credit card processing] equipment that charges more than [six per cent], said Medallion Owner (or Lessee in a Medallion-only lease) shall be responsible for any credit card processing fee charged that is greater than [six per cent] of the fare." Rule 403, § 4(II)(g).

compensation whatever profits accrued from the business.  [The distributor] was paid nothing by the oil company.  No part of the regular business of the oil company was entrusted to [the distributor]. . . .  [T]he only relationship that it created was that of buyer and seller").  Although the plaintiffs may incidentally contribute to the owners' advertising revenues, the second prong "should not be construed to include all aspects of a business such that [the first and third] prongs . . . become unnecessary."  Advisory 2008/1, supra.

Further, the fact that the radio associations advertise taxicab services has nothing to do with the leasing transactions between the drivers and medallion owners.  The plaintiffs' argument requires us to accept the premise that the owners and radio associations are one and the same.  As indicated above, we reject that premise.  Rule 403 creates separately defined businesses within the taxicab industry.  Absent evidence that a medallion owner and radio association are alter egos, there is no cause to ignore the distinction drawn by the regulation.  See Middlesex Retirement Sys., LLC, 453 Mass. at 503.  See also Hingham Healthcare Ltd. Partnership, 439 Mass. at 651 n.9.  Consequently, if the medallion owners are to be deemed in the business of transporting customers for fares, the evidence supporting that conclusion would need to derive from their own representations and conduct.

The summary judgment record does not reflect that any of the medallion owners -- separate and apart from their involvement in the radio associations -- held themselves out as providing transportation services to passengers. Tutunjian describes his companies as leasing taxicabs, managing the leasing of taxicabs, providing taxicab dispatch services, and providing limousine services. Byda describes his companies as "taxicab" businesses. With respect to Summers, the only evidence relates to USA Taxi, which neither owns nor leases taxicabs or medallions. USA Taxi describes its business as "taxi service," which is precisely what the company does: it services taxicabs. The plaintiffs did not provide services in the ordinary course of the medallion owners' business, i.e., the leasing of taxicabs and medallions.

It is true that the radio associations advertise themselves as providing taxicab services and that they arrange for the transportation of passengers. Yet, these facts, helpful as they are to the plaintiffs' cause, see Athol Daily News, 439 Mass. at 179, do not override the realities of the radio associations' actual business operations or the regulatory framework in which those operations occur. In contrast to the Athol Daily News case, the radio associations' business is not directly dependent on the drivers' services. Rather, Rule 403 requires medallion owners to purchase dispatch services regardless of how often

those services are used in the transportation of passengers. Rule 403, § 4(II)(q). In other words, the radio associations' raison d'etre, per Rule 403, is to provide dispatch services to medallion owners -- a service that is funded by medallion owners and only incidentally dependent on drivers.

The voucher program is likewise incidental to the ordinary course of the radio associations' business. The voucher program makes the dispatch services more attractive to their customers (medallion owners) because it creates a base of customers (passengers) for the medallion owners' customers (drivers). See Rev. Rul. 71-572, 1971-2 C.B. 347 ("use of two-way radio communication, dispatchers, and advertising media . . . will enhance the lessee's profits by making more 'trips' available to him at the same time that it increases the lessor's ability to rent his taxicabs to the maximum extent, thereby increasing his profits"). The benefit inuring to the drivers, for which Rule 403 permits a measure of compensation capped at eight per cent of the fare, is incidental to the ordinary course of the radio associations' business of selling dispatch services to medallion owners. Cf. Cannon v. Crowley, 318 Mass. 373, 376 (1945) ("One may also be engaged in a business that cannot be conducted unless he . . . can ship the finished product to the various markets. It is hard to imagine a business that is not dependent in some way upon transportation. In such instances, while

transportation is a necessity, it does not thereby become a part of or a process in the business but it continues as ancillary and incidental thereto"). Accordingly, we conclude that the transportation of passengers for fares is not in the ordinary course of either the medallion owners' or radio associations' businesses. The defendants have satisfied the second prong of the independent contractor test.

e. Engagement in an independently established business. The third prong requires that the drivers be "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." G. L. c. 149, § 148B (a) (3). The critical inquiry under this prong is whether "the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." Athol Daily News, 439 Mass. at 181.

As the defendants point out, Rule 403 creates a framework such that leasing taxicabs, dispatching taxicabs, and transporting passengers for fares each may function as a separate and distinct business. Drivers may lease taxicabs and medallions from whomever they wish. Each day of the week, they may lease from a different owner, each using a different radio

association.  Drivers earn as much as they are able and need not accept a single dispatch.  See Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. at 432 (taxicab drivers' ability to generate own businesses while using leased taxicab was evidence of "'entrepreneurial' spirit, exhibited by a typical independent contractor").  They are also free to advertise their services through personalized business cards.  See Athol Daily News, 439 Mass. at 182 ("The fact of the matter is that the carriers are free to advertise their delivery services . . . . The breadth of each carrier's delivery service is a function, not only of the original subscriber list given to the carrier by the [company], but of the individual initiative of the carrier. . . . This in itself is compelling evidence that a carrier is an entrepreneur . . .").  The defendants have carried their burden under the third prong.

f.  Coexistence of Rule 403 and the independent contractor statute.  It is plain that our conclusion today rests in significant part on the regulatory framework created by Rule 403.  It is, of course, true that Rule 403 cannot trump the independent contractor statute.  See Boston Gas Co., 420 Mass. at 703.  Yet, Rule 403 does nothing to bar medallion owners from entering into employer-employee relationships with drivers, nor does it characterize workers as independent contractors where they would otherwise fit the definition of employees.  Rather,

it creates a system whereby taxicab drivers may operate as employees or as entrepreneurs with their own separately defined and separately regulated businesses.

In deciding whether this system conflicts with the independent contractor statute, we are guided by the Legislature's intent. We have recognized that "[m]isclassification not only hurts the individual employee; it also imposes significant financial burdens on the Federal government and the Commonwealth in lost tax and insurance revenues," and "gives an employer who misclassifies employees as independent contractors an unfair competitive advantage over employers who correctly classify their employees and bear the concomitant financial burden." Somers, 454 Mass. at 593. Many of these concerns, however, are simply not applicable to taxicab drivers operating under flat-rate leases because such drivers are not included in the definition "employees" for purposes of workers compensation premiums, unemployment insurance contributions, and income tax withholding. See G. L. c. 152, § 1 (4);[12] Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. at

---

[12] Under the workers' compensation law, the term "employee" means:

"every person in the service of another under any contract of hire, express or implied, oral or written, excepting . . . a person who operates a taxicab vehicle which is leased by such person from a taxicab company pursuant to an independent contract which specifically provides for a

432;[13] Rev. Rul. 71-572, 1971-2 C.B. 347; 830 Code Mass. Regs.
§ 62B.2.1(3)(b) (2005).[14]

---

> rental fee or other payment to the owner of such taxicab
> vehicle which is in no way related to the taxicab fares
> collected by such person; and provided, further, that such
> person is not treated as an employee for Federal tax
> purposes."

G. L. c. 152, § 1 (4).

[13] General Laws c. 151A, § 2, prescribes a three-part test
for determining whether an individual is an "employee" for
unemployment insurance purposes. The first and third parts of
that test are identical to the test prescribed by the
independent contractor statute, G. L. c. 149, § 148B. However,
the second part diverges by allowing an entity to establish
either that the service was performed "outside the usual course
of [its] business" or "outside of all the places of business of
the enterprise for which the service is performed." G. L.
c. 151A, § 2 (b). In Commissioner of the Div. of Unemployment
Assistance v. Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. 426
(2007), the Appeals Court held that taxicab owners were not
required to pay unemployment insurance premiums for drivers,
where, inter alia, (1) "the drivers . . . were not obligated to
respond to calls from [the owner] regarding a prospective
customer"; (2) "the drivers did not transport customers on [the
owner's] premises"; and (3) "[the owner] permitted them to
engage in other employment or generate their own businesses
while using the leased taxi." Id. at 430-432. See Athol Daily
News, 439 Mass. at 179 n.11 ("assertion that the [newspaper's]
'places of business,' for purposes of the second part of the [c.
151A] test, includes the geographic area tracked by all of the
[newspaper's] delivery routes, is illogical").

[14] In Rev. Rul. 71-572, the Internal Revenue Service (IRS)
examined "whether taxicab owners or operators, carrying on their
transportation services pursuant to 'lease' agreements with a
taxicab company . . . [were] employees of the taxicab company
for purposes of the Federal Insurance Contributions Act, the
Federal Unemployment Tax Act, and the Collection of Income Tax."
The IRS observed that a taxicab company did not exercise or have
the right to exercise direction and control over the taxicab
drivers in the performance of their services. It had "no right
to obtain, for its own benefit, an accounting with respect to

We also observe that if drivers operating in the shifted model were employees, then the shift fees (or lease payments) on which that model rests would clearly violate public policy as payments required for the right to work. See Awuah v. Coverall N. Am., Inc., 460 Mass. 484, 498 (2011). Such a result would be patently inconsistent with the Legislature's indorsement of the lease model, which is implicit in the exemption of taxicab lessees from the definition of employee in the workers' compensation law. G. L. c. 152, § 1 (4). "[W]here two or more statutes relate to the same subject matter, they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." Board of Educ. v. Assessor of Worcester, 368 Mass. 511, 513-514 (1975).

Relying on subsection (b) of G. L. c. 149, § 148B, the independent contractor statute, the plaintiffs argue that the workers' compensation and other exemptions are not relevant to whether taxicab drivers are employees for purposes of the Wage

_____

the fares collected for operation of the taxicabs." Rather, it had "only the right to receive the specified regular payment." Accordingly, the IRS held that lessee taxicab drivers are not employees of the company for Federal employment tax purposes. Rev. Rul. 71-572, 1971-2 C.B. 347. "Taxpayers generally may rely upon Revenue Rulings published in the Bulletin in determining the tax treatment of their own transactions and need not request specific rulings applying the principles of a published Revenue Ruling to the facts of their particular cases." 26 C.F.R. § 601.601(d)(2)(v)(e) (2014). Massachusetts applies the Federal standard for the applicability employment tax withholding. 830 Code Mass. Regs. 62B.2.1(3)(b) (2005).

Act.  Subsection (b) provides that "[t]he failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers' compensation premiums with respect to an individual's wages shall not be considered in making a determination under this section."  The plaintiffs interpret this language to mean that the Legislature intended the scope of employment to be wider with respect to the Wage Act.  We do not read subsection (b) so broadly.

"A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result."  Sullivan v. Brookline, 435 Mass. 353, 360 (2001).  The word "failure" means the "neglect of an assigned, expected, or appropriate action." Webster's Third New International Dictionary 815 (1993).  In other words, it implies the existence of an affirmative duty or obligation.  Yet, with respect to taxicab drivers operating on flat rate leases, the laws exempt medallion owners from making unemployment insurance contributions, paying workers' compensation premiums, and withholding Federal and State income taxes.  See notes 12, 13, and 14, supra.  Where there is no such duty there is no failure.

The more harmonious reading of the statutory framework is that the Legislature intended to preserve the ability of taxicab

drivers to operate as either employees or independent contractors. If, for example, a driver did not qualify for the exemption from the workers' compensation law, the "employer's belief that a worker should be an independent contractor has no relevance in determining whether there has been violation of the Law," vis-à-vis the failure to pay workers' compensation premiums. Advisory 2008/1, supra. Rule 403 does no violence to the Legislature's intent.

The plaintiffs speculate that our decision today will provide incentives for businesses in other industries to deconstruct their operations into component parts to avoid the strictures of the Wage Act. This concern is not warranted. Our cases are clear that employers may not circumvent the Wage Act or other laws affecting employee compensation by creating illusory distinctions in the services they provide. See Depianti, 465 Mass. at 623-624; Awuah, 460 Mass. at 498; DiFiore, 454 Mass. at 496. Importantly, however, those are not the facts of this case.

The medallion owners and radio associations merely complied with a regulatory framework that separately defines different services as different businesses. In other words, the distinctions in services within the taxicab industry as a whole are not illusory, but quite real. Contrast Massachusetts Delivery Ass'n, 769 F.3d at 14, 21 n.4. None of the defendants

was required to engage in the distinct business of transporting customers for fares and, indeed, they chose not to do so.  We conclude that there is no conflict between Rule 403 and the independent contractor statute either facially or as applied in this case.  See Arbella Mut. Ins. Co., 456 Mass. at 77.  See also Town Taxi Inc. v. Police Comm'r of Boston, 377 Mass. 576, 585 (1979) ("question whether the taxi industry monopoly created by the applicable statutes is wise as a matter of economic and social policy is, of course, not subject to judicial review").  Because the owners and radio associations have, in complying with Rule 403, satisfied each prong of the independent contractor test, summary judgment should have been granted in favor of Tutunjian, Summers, Byda, EJT, Boston Cab, and Independent Taxi on count one of each of the complaints.

3.  Conclusion.  We vacate the order denying summary judgment to the defendants and remand the case to the Superior Court for entry of judgment in favor of the defendants on count one of each of the complaints, and for further proceedings consistent with this opinion.

So ordered.