TIGER HOME INSPECTION, INC. vs. DIRECTOR OF THE DEPARTMENT OF UNEMPLOYMENT ASSISTANCE, 101 Mass. App. Ct. 373

 
 TIGER HOME INSPECTION, INC. vs. DIRECTOR OF THE DEPARTMENT OF UNEMPLOYMENT ASSISTANCE.

101 Mass. App. Ct. 373
 November 18, 2021 - July 13, 2022

Court Below: District Court Department, Quincy Division
Present: Neyman, Singh, & Grant, JJ.

 

No. 19-P-1721.

Employment Security, Employment relationship, Burden of proof.

This court reversed the decision of a District Court judge affirming a determination of the Department of Unemployment Assistance that inspectional services performed by individual inspectors on behalf of the plaintiff company, which was in the business of providing inspectional services for real properties, constituted employment within the meaning of G. L. c. 151A, such that the plaintiff was responsible for contributions to the unemployment compensation fund and the inspectors were eligible to apply for unemployment benefits, where the plaintiff met its burden to show that the inspectors were not employees, in that the plaintiff established that the inspectors performed their services at customer locations and entirely outside of the plaintiff's place of business [376-377]; in that the undisputed evidence showed that the inspectors performed their services free from the plaintiff's direction and control [377-380]; and in that the inspectional services in question were an independent trade and the inspectors were capable of performing the services for anyone wishing to avail themselves of the services (i.e., the plaintiff permitted the inspectors to advertise and perform inspectional services for others as part of their own independent enterprises) [380-382].

Civil action commenced in the Quincy Division of the District Court Department on August 1, 2012.

 Following remand to the board of review of the Department of Unemployment Assistance, the case was heard by Mark S. Coven, J.

 Joseph J. Brodigan, Jr., for the plaintiff.

 Eric A. Haskell, Assistant Attorney General (John P. Cronin also present) for the defendant.

 SINGH, J. Tiger Home Inspection, Inc. (Tiger), a company in the business of providing inspectional services for real properties, 

 Page 374 

appeals from a District Court decision [Note 1] affirming a final status determination of the Department of Unemployment Assistance (DUA). The determination, that the inspection services performed by individuals on behalf of Tiger constitute "employment" within the meaning of the unemployment insurance statute, G. L. c. 151A, had the consequence of making Tiger responsible for contributions to the unemployment compensation fund and the inspectors eligible to apply for unemployment benefits. Determining that Tiger met its burden to show that these inspectors are not employees, we reverse.

 Background. [Note 2] 1. Tiger operations. For the past thirty years, Tiger has been in the business of providing inspectional services including radon, septic, water, and lead testing for commercial and residential properties. Approximately ten years into Tiger's operations, those performing inspectional services for residential properties were required to be licensed by the Commonwealth, [Note 3] see St. 1999, c. 146; G. L. c. 112, § 222, added by St. 2000, c. 313, § 34, and subject to the requirements of title 266 of the Code of Massachusetts Regulations. [Note 4] At the time of the proceedings 

 Page 375 

in this case, Tiger had an office with approximately a dozen employees, consisting of office staff, including marketing and sales personnel and managers. Inspectors had no need to travel to Tiger's office. Tiger also had a website advertising its services, featuring individual inspectors, depicted in shirts bearing the Tiger logo. Inspectors were provided these Tiger shirts but were not required to wear them. They were also provided with Tiger business cards on request. 

 Anyone seeking inspectional services could contact Tiger, which operated seven days a week and offered inspections in three time slots each day. Tiger had a pool of approximately thirty inspectors from which to fulfill customers' requests for services. When joining the Tiger pool, inspectors signed affidavits acknowledging that they were independent contractors. Inspectors paid their own licensing fees, workers' compensation insurance premiums, and health insurance premiums. Tiger purchased errors and omissions insurance, statutorily required of licensed home inspectors, which covered the inspectors only while they worked on Tiger inspections. Tiger conducted quarterly meetings to provide updates on relevant regulations, but inspectors were not required to attend. Tiger also offered continuing education classes, but these were open to any inspector within the State and were paid for by those attending. 

 Inspectors could perform as many or as few inspections as they desired and could reject any offer without consequence. Inspectors were offered jobs based on their availability, as indicated by schedules submitted by the inspectors themselves. An inspector who accepted an offer got the job. The inspector traveled to the inspection site at the inspector's own expense, performed the inspection using the inspector's own tools and equipment (which could include ladders, flashlights, clipboards, voltage indicators, and circuit testers, among other instruments), and provided to the customer an inspection report, bearing the Tiger name and the inspector's license number; a copy of the report was maintained by Tiger. The inspector's only guidance as to how to accomplish the job was that provided by regulation.

 The inspector collected payment from the customer for the inspection and turned it over to Tiger. Tiger paid the inspector a percentage of the inspection fee charged to the client, according to the established agreement between Tiger and that particular inspector; Tiger negotiated different payment percentage rates with each inspector. Any complaints about errors were fielded by 

 Page 376 

a Tiger manager, and if validated, inspectors were required to contribute to any remedial costs. If Tiger wished to terminate its relationship with an inspector, it simply stopped offering jobs to that inspector.

 2. Status of inspectors. In the summer of 2008, Tiger discontinued using the services of a licensed home inspector and opposed his application for unemployment insurance benefits on the basis that the inspector was an independent contractor and not an employee. Following an investigation, DUA's employer liability unit concluded that, not only was that inspector an employee, but also that other "similarly employed" inspectors were employees as well. See G. L. c. 151A, §§ 2 (a)-(c), 12. Thereafter, the case traveled through more than a decade of proceedings including four evidentiary hearings before two different DUA review examiners, three appeals to the DUA board of review (board), two remands, and three judicial reviews in the District Court. [Note 5] See G. L. c. 151A, §§ 39-42. Each decision maker, except DUA's audit department, determined that Tiger and the inspectors were in an employment relationship. [Note 6]

 Discussion. In the statutory scheme governing unemployment insurance, all services performed by an individual for an "employing unit" are presumed to be employment unless the "ABC test" is satisfied. See G. L. c. 151A, §§ 1 (j), 2; Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 175-176 (2003). The three-part, conjunctive test requires the entity seeking to rebut the presumption to prove that "(a) such individual has been and will continue to be free from control and direction in connection with the performance of such services, both under his contract for the performance of service and in fact; and (b) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (c) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." G. L. c. 151A, § 2.

 Page 377 

 Here, the board determined that Tiger satisfied prong (b), as it established that the inspectors performed their services at customer locations and entirely outside of Tiger's place of business. It also determined, however, that Tiger had failed to meet its burden with respect to prong (a), concluding that Tiger "exercised considerable direction and control" over the inspectors and "closely monitored" their work, and that Tiger had failed to meet its burden with respect to prong (c), concluding that, although the inspectors were free to perform inspections outside of the Tiger context, "none of them did so," and that they were "compelled to rely heavily" on Tiger for business.

 We review board decisions under a deferential lens, applying the standards set forth in G. L. c. 30A, § 14 (7). See Subcontracting Concepts, Inc. v. Commissioner of the Div. of Unemployment Assistance, 86 Mass. App. Ct. 644, 646 (2014). An administrative decision unsupported by substantial evidence or based upon an error of law, however, cannot stand. See, e.g., Athol Daily News, 439 Mass. at 174-176. The question whether Tiger, based upon the undisputed facts, met its burden of demonstrating that the inspectors were not employees, is one of law. See id. at 176; Driscoll v. Worcester Tel. & Gazette, 72 Mass. App. Ct. 709, 714 (2008).

 1. Prong (a) -- direction and control. Prong (a) turns on "two critical questions: did the person performing services (1) have the right to control the details of how the services were performed; and (2) have the freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work'" (footnote omitted). Subcontracting Concepts, Inc., 86 Mass. App. Ct. at 648, quoting Athol Daily News, 439 Mass. at 177.

 Here, the undisputed evidence showed that inspectors performed their services free from Tiger's direction and control. Inspectors could work as little or as much as they wanted for Tiger. Some inspectors only performed a couple of inspections per month, while others worked several days per week. The inspectors worked at their own pace. Although inspectors submitted schedules showing their availability, they could refuse any assignment offered by Tiger without penalty. Compare Commissioner of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. 426, 430 (2007) (Town Taxi of Cape Cod, Inc.) (drivers free from control and direction where they chose which shifts to work and were not obligated to respond 

 Page 378 

to dispatches to accept customers). See Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 332 (2015) (citing with approval Attorney General advisory that "an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job"). [Note 7]

 As long as the inspections met State standards, the means and methods of performance -- such as the sequence of the system inspections and the length of time taken for each job -- were left entirely to the discretion of the individual inspectors. Once inspectors accepted an assignment from Tiger, they performed their inspectional services without any communication with Tiger. They contacted the customers directly, traveled to the inspection sites in their own vehicles and at their own expense, performed the inspections using their own tools and equipment, and issued inspection reports to the customers without any involvement by Tiger. Inspectors were even permitted to hire helpers at their own cost without having to obtain approval from Tiger. Compare Athol Daily News, 439 Mass. at 178 (carriers free from direction and control where carriers only required to deliver newspapers in good condition by certain time and were otherwise free to deliver in whatever manner they chose). Contrast Subcontracting Concepts, Inc., 86 Mass. App. Ct. at 648 (company exercised substantial control over numerous details of performance where delivery drivers were required to follow particular routes and schedules, ensure anyone working with them met company standards, and maintain delivery vehicles in particular manner).

 In determining that Tiger "exercised considerable direction and control," the board considered that customers had to go through Tiger's office to get an inspection, and that any customer who contacted an inspector directly to schedule an inspection was to be referred to Tiger for central scheduling. Additionally, the board considered that customer payments were made to Tiger and not to the inspectors directly. The board also considered that inspectors were issued shirts with Tiger logos and were featured on the Tiger 

 Page 379 

website wearing those shirts, and that inspection reports were on Tiger letterhead. Additionally, the board considered that Tiger provided a manager to deal with customer complaints and that it purchased errors and omissions insurance for the inspectors. 

 While these factors may bear on the matter, none of them goes to the essential inquiry, which is the extent of direction and control over the work of the inspectors. [Note 8] See Athol Daily News, 439 Mass. at 178 (factors relied on by board -- that price is determined by company, that customers may complain about workers to company, that company manager is responsible for workers, and that company can terminate agreement at any time -- go to the workers' relationship with the company "and are not indices of control over the details of the [workers'] performance as contemplated by [G. L. c. 151A,] § 2 [a]"). Indeed, many of the details noted by the board are those that would be expected by any company seeking to generate business through its own brand. See Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. at 427-428 & n.4 (drivers deemed independent contractors, even though they were provided with company taxicabs and were allowed to use their own cars only as long as they bore name of company; were provided with company business cards; picked up customers offered to them by the company which received calls for rides; and were required to turn over one-half of the money received from fares to company).

 To the extent that the board considered factors that did focus on control and direction in connection with the inspectors' performance of services, that analysis was flawed. The board cited Tiger requirements that are also regulatory requirements. For example, the board noted that inspectors had to complete a written report following each inspection, but this report is mandated by 

 Page 380 

regulation. See 266 Code Mass. Regs. § 6.03 (2008). That Tiger required the inspectors to meet regulatory standards does not show Tiger's direction and control. See Sebago, 471 Mass. at 324, 332-333 (drivers required to comply with detailed city regulations governing their operations but otherwise free from direction and control by company); Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. at 427-428 (drivers free from direction and control even though they had to comply with all requirements associated with having hackney licenses). Moreover, the board conflated the regulatory requirements of trainees and associate home inspectors with those of licensed home inspectors. For example, the board noted that trainees and associate home inspectors are required to be supervised by licensed home inspectors and their inspection reports reviewed, and then concluded that licensed home inspectors are closely monitored. The record does not support that Tiger closely monitored the performance of inspectors. [Note 9]

 The totality of the board's findings and unchallenged facts leads to the firm conclusion that inspectors perform services for Tiger free from control or direction within the meaning of prong (a). See Sebago, 471 Mass. at 332-333.

 2. Prong (c) -- independently established trade or business. Prong (c) turns on "whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." Athol Daily News, 439 Mass. at 181. Here, there is little question that the "service in question" -- inspectional services -- is an independent trade and that the inspectors are capable of performing the services for anyone wishing to avail themselves of the services. Inspectors are subject to licensure requirements, and upon the completion of those requirements, are able to perform inspectional services for any homeowner who desires their services. They have no need to 

 Page 381 

depend on any other business or enterprise in order to perform their services for customers.

 Indeed, the evidence showed not only that inspectors were capable of performing inspectional services independently, but that Tiger permitted inspectors to advertise, and perform, inspectional services for others as part of their own independent enterprises. In concluding that Tiger had not satisfied prong (c), the board acknowledged that the inspectors were capable of performing inspections independently, but were "unconvinced that any of them did so." 

 The pertinent inquiry, however, is not whether the inspectors in fact operated their own businesses, but whether they were free to do so. See Athol Daily News, 439 Mass. at 180, 182 (deeming "far too stringent" board's requirement that, to satisfy prong [c], worker's services must "constitute in fact an independently established enterprise capable of operating without the benefit of its relationship"; and where carriers had right to advertise their delivery services if they desired, board's observation that none of the carriers actually did advertise "misse[d] the mark"). 

 Relying on Coverall N. Am., Inc. v. Commissioner of the Div. of Unemployment Assistance, 447 Mass. 852, 858-859 (2006), the board determined that the absence of credible evidence indicating that the inspectors were actually engaged in independent enterprises suggested that the inspectors were compelled to rely heavily on Tiger's business to perform inspections. The comparison to Coverall is inapt. There, the company failed to satisfy its burden with respect to prong (c), not simply because the worker had no outside work, but because, even though theoretically capable of working independently, "the nature of the business" compelled the worker to depend on the company. [Note 10] See id. at 858. By contrast here, there is nothing in the nature of inspectional 

 Page 382 

services that compels an inspector to depend on a single employer for the continuation of services. Nor is there anything peculiar with respect to the inspectors' services here so as to make them dependent on Tiger. See Athol Daily News, 439 Mass. at 181-182 ("[b]y its very nature, the business of delivering newspapers is not limited to a single employer, and nothing with respect to the carriers' job performance in this case is unique to one certain newspaper publisher").

 The board noted that "[b]y directing that all clients who reached out to the inspectors had to be referred to the employer's office, [Tiger] prevented them from performing independent services for its clients." This conclusion is unwarranted from the record. There was evidence that inspectors who were approached directly to schedule a Tiger inspection were to refer the request to the Tiger office for central scheduling. However, there was no evidence that inspectors were required to refer all potential customers to Tiger; to the contrary, the evidence was that inspectors were free to advertise their own services, and maintain their own customers. Since Tiger did not tie up the schedules of the inspectors, allowing them to work as little as they liked, it did not place any barriers to inspectors being able to maintain their own businesses. [Note 11]

 The totality of the board's findings and unchallenged facts leads to the firm conclusion that the services performed by inspectors -- inspectional services -- constitute an independent trade within the meaning of prong (c). See Athol Daily News, 439 Mass. at 181-182.

 Conclusion. Our review of the administrative record reveals that Tiger met its burden to establish that inspectors were not employees. As a result, the case is remanded for the entry of a judgment reversing the decision of the board.

 So ordered.

FOOTNOTES
[Note 1] Although Tiger appealed from the "judgment," no actual judgment has entered in the District Court. The parties have treated the judge's "findings of fact and rulings of law" dated August 7, 2019, as a judgment. Given the length of these proceedings, and where no meaningful purpose would be served by a remand, we shall also treat the judge's August 7, 2019, decision as a final judgment. See GTE Prods. Corp. v. Stewart, 421 Mass. 22, 24 n.3 (1995). 

[Note 2] The facts are taken from the findings made by the review examiner and adopted by the board, supplemented by uncontroverted evidence in the record. See Deveau v. Commissioner of Revenue, 51 Mass. App. Ct. 420, 421 (2001). 

[Note 3] The licensing scheme dictates requirements for trainees and associate home inspectors, as well as licensed home inspectors. See G. L. c. 112, § 222; 266 Code Mass. Regs. §§ 4.00 (2008). In addition to various educational prerequisites, trainees must complete twenty-five home inspections under the direct supervision of a licensed home inspector to be eligible to become an associate home inspector. See 266 Code Mass. Regs. § 4.04. Associate home inspectors must complete one hundred additional home inspections under the direct or indirect supervision of a licensed home inspector to be eligible to become a licensed home inspector. See id. There are also continuing education requirements imposed on all licensed home inspectors and associate home inspectors. See 266 Code Mass. Regs. § 5.01 (2008). The DUA determination encompassed trainees and associate home inspectors as well as licensed home inspectors. 

[Note 4] State regulations implemented pursuant to G. L. c. 112, §§ 221-226, impose standards governing the scope of home inspections, which cover numerous component systems, including roofing, exterior cladding, masonry, structural, electrical, plumbing, heating, central air conditioning, general interior conditions, and insulation and ventilation. See 266 Code Mass. Regs. § 6.04 (2008). 

[Note 5] In August 2010, the District Court affirmed the DUA's determination that the licensed home inspector seeking unemployment benefits was an employee. That determination is not before us in this appeal. 

[Note 6] On October 27, 2008, a DUA revenue auditor notified Tiger that based on her review of all company records and documents, Tiger was fully in compliance with G. L. c. 151A for calendar year 2007. 

[Note 7] Although Sebago discussed employment under the Wage Act, G. L. c. 149, and not under the unemployment insurance statute, G. L. c. 151A, both provisions define employment in terms similar enough that analysis under one provision is instructive as to the other. Compare G. L. c. 151A, § 2, with G. L. c. 149, § 148B (a). See Patel v. 7-Eleven, Inc., 489 Mass. 356, 360 (2022) (Wage Act case discussing "ABC test"); Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009) (Wage Act case noting "nearly identical language in G. L. c. 151A, § 2"). 

[Note 8] The board found these factors significant because it interpreted them as Tiger holding itself out as the employer of the inspectors. For example, Tiger referred to its "staff" of inspectors on its website and purchased errors and omissions insurance, required to be maintained by the inspectors themselves or carried by the entity with which the inspector is engaged as a "contracted employee." G. L. c. 112, § 225. Although the manner in which a company holds itself out is not one of the ABC factors, it has been considered in connection with determining the employer's "usual course of the business" under prong (b). See Sebago, 471 Mass. at 335-336. Here, prong (b) was deemed to have been satisfied by virtue of the "second component of the either-or test," Athol Daily News, 439 Mass. at 179, as the inspectors performed their services outside of Tiger's place of business. Where the only prongs under consideration were prongs (a) and (c), the manner in which Tiger held itself out was of limited significance. 

[Note 9] The board noted that the regulatory supervision imposed on trainees and associate home inspectors makes it impossible to demonstrate that they are free from direction and control "as a matter of law." We note that the proper inquiry is whether the worker is free from the employer's direction and control with respect to the performance of their services. On that count, the record reflects that the work of trainees and associate home inspectors is no more directed or controlled by Tiger than that of licensed home inspectors, apart from that necessary to comply with the regulations. 

[Note 10] In Coverall, the company held itself out as a franchisor of a cleaning business; the worker purchased a franchise and was given a single client account. See Coverall, 447 Mass. at 854. The company negotiated directly with the client and provided the worker with daily cleaning plans to which the worker was required to adhere. See id. at 854-855. The client directed the worker to complete a list of daily tasks, the worker was required to check in and check out with the client each day, and the company supervised the worker through a field consultant. See id. at 854. Additionally, the worker was required to work Monday through Friday, five hours each day, but soon found that the work could not be accomplished in this time frame and so ended up working weekends as well. See id. at 855. In the circumstances, the worker's theoretical ability to work independently was not actually possible and the worker thus became dependent on the company. See id. at 859. See also Athol Daily News, 439 Mass. at 181, citing Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 481 (2002) (bicycle couriers not engaged in independent enterprise where "option of performing the same services for similar companies was, as a practical matter, unavailable to the bicycle couriers"). 

[Note 11] The board noted that, because trainees and associate home inspectors were prohibited from performing home inspections by regulation, "they were incapable of engaging in an independent enterprise as a matter of law." We note that the regulations allow trainees and associate home inspectors to maintain a home inspection business if they have "a duly licensed Home Inspector on staff who is responsible for all inspection activities and all inspections comply with [266 Code Mass. Regs. §§] 6.00 et seq." See 266 Code Mass. Regs. § 4.07(8) (2008). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.