NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-82                                          Appeals Court

SUZANNE E. CAREY, personal representative,[1]  vs.  GATEHOUSE MEDIA
MASSACHUSETTS I, INC.


No. 17-P-82.

Norfolk.      September 14, 2017. - February 27, 2018.

Present:  Green, Sullivan, & Sacks, JJ.


Independent Contractor Act.  Newspaper.  Carrier.  Federal
    Preemption.  Statute, Federal preemption.  Waiver.
    Practice, Civil, Summary judgment, Waiver.



        Civil action commenced in the Superior Court Department on
September 22, 2011.

        Motions for summary judgment were heard by Angel Kelley
Brown, J.; the entry of separate and final judgment was ordered
by her; and a motion for postjudgment relief was heard by her.


        Mark W. Batten for the defendant.
        James W. Simpson, Jr., for the plaintiff.
        Peter J. Caruso & Robert J. Ambrogi, for Massachusetts
Newspaper Publishers Association, amicus curiae, submitted a
brief.

_____

        [1] Of the estate of David King, who passed away while the
appeal was pending.  King had filed suit individually and on
behalf of other similarly situated individuals.

SACKS, J.   Defendant GateHouse Media Massachusetts I, Inc. (GateHouse), publisher of the Patriot Ledger newspaper, appeals from a separate and final judgment under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), declaring that David King, who had delivered the Patriot Ledger by automobile to some of its subscribers, was, under G. L. c. 149, § 148B (§ 148B), GateHouse's employee rather than an independent contractor. Gatehouse also appeals from the denial of its motion for relief from the rule 54(b) judgment, which asserted that the relevant portion of § 148B is preempted by the Federal Aviation Administration Authorization Act of 1994 (FAAAA), codified at 49 U.S.C. § 14501(c)(1).   We affirm.[2]

Background.   We recount certain undisputed material facts from the summary judgment record, reserving for later discussion the details of GateHouse's contract with King.  GateHouse, a subsidiary of New York-based GateHouse Media, "publishes and distributes" a variety of daily and weekly newspapers within Massachusetts.  Gatehouse describes itself as a publisher and distributor of publications in its "Wholesale Agreements" with newspaper delivery drivers such as King.  GateHouse employs a sales and advertising department, which works to increase circulation and advertising revenue.  Among GateHouse's

---

[2] We acknowledge the amicus brief submitted by the Massachusetts Newspaper Publishers Association.

newspapers is the Patriot Ledger, published on all five weekday afternoons and on Saturday mornings.

GateHouse distributes the Patriot Ledger out of a distribution center in Braintree, employing supervisors, district managers, distribution managers, and others to manage that process.  GateHouse has three main distribution methods. First, to distribute the newspaper to residential and business subscribers, GateHouse enters into agreements with individual carriers,[3] whom it classifies as independent contractors.  The carriers are required to buy copies of the newspaper from GateHouse at wholesale rates, for resale and distribution within delivery areas designated by GateHouse.  Second, GateHouse hires unionized employees to distribute bulk quantities of the newspaper to various types of stores, where they are resold at retail.  Third, GateHouse reaches some customers through online publishing.

King became a carrier for GateHouse in 2009, using his own automobile to deliver up to 250 copies of the Patriot Ledger, six days per week, in the Weymouth area.  His contract was terminated in 2011, apparently by GateHouse, for reasons not stated in the record.

---

[3] In this opinion we use the terms "carriers" and "drivers" interchangeably; although not material for present purposes, we note that some carriers cover their delivery areas on foot.

King then filed this action in Superior Court, asserting that GateHouse had misclassified him as an independent contractor rather than an employee under § 148B.  He also asserted claims -- dependent on his being an employee under § 148B[4] -- that GateHouse had deducted unauthorized charges and fees from its payments to him, in violation of G. L. c. 149, §§ 148 and 150; failed to pay him a minimum wage, in violation of G. L. c. 151, § 1; and violated his rights under the tip-sharing statute, G. L. c. 149, § 152A.  He also asserted an unjust enrichment claim.  King sought to represent, and later obtained certification of, a class consisting of all individuals who had signed a written contract to deliver the Patriot Ledger and had provided delivery services under those contracts, during the "class period."[5]

On cross motions for summary judgment limited to the misclassification claim, the judge ruled in July, 2014, that under § 148B, King was an employee, rather than an independent contractor.  She based her ruling on GateHouse's inability to meet its burden of proving that the service furnished by King was "performed outside the usual course of the business of the

---

[4] Section 148B determines employee status "[f]or the purpose of this chapter [149] and chapter 151."  G. L. c. 149, § 148B(a), as appearing in St. 2004, c. 193, § 26.

[5] That period is not specified in the record materials before us.

employer," as is required under prong two of § 148B's three-prong test. See Somers v. Converged Access, Inc., 454 Mass. 582, 588-589 (2009), citing Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 175 (2003) (Athol Daily News), and its interpretation of "nearly identical language in G. L. c. 151A, § 2." The judge therefore did not decide whether GateHouse could meet its burden under prongs one and three.[6] After an additional sixteen months of motion practice over individual damages, prejudgment interest, and class certification, the parties moved for, and in November, 2015, the judge ordered, entry of a separate and final judgment, under Mass.R.Civ.P. 54(b), on the misclassification claim. GateHouse appealed.

After the appeal was docketed in this court in August, 2016, GateHouse sought and obtained a stay of appellate proceedings and leave to file a motion for relief from judgment in the trial court. The basis for GateHouse's motion was that two recent Federal appellate decisions had held prong two of § 148B to be preempted, as to certain delivery drivers, by a

---

[6] The judge observed as to the first prong that the question of GateHouse's "control" over its drivers was "a close call." As to the third prong, the judge noted King's failure to contest GateHouse's contention that he was customarily engaged in an independently established trade or business and that King and other drivers also delivered newspapers other than the Patriot Ledger, but she reached no conclusion as to that prong.

section of the FAAAA, codified at 49 U.S.C. § 14501(c)(1),
concerning motor carriers' transportation of property.  See
Schwann v. FedEx Ground Packaging Sys., Inc., 813 F.3d 429 (1st
Cir. 2016) (Schwann); Massachusetts Delivery Assn. v. Healey,
821 F.3d 187 (1st Cir. 2016) (Massachusetts Delivery Assn.).
GateHouse asked that the rule 54(b) judgment be vacated so that
it could assert a similar preemption defense.  In December,
2016, the judge denied the motion on the ground, among others,
that GateHouse had waived the issue by not asserting the
preemption defense in its answer or summary judgment motion.[7]
GateHouse's appeal of this ruling was consolidated with its
appeal of the rule 54(b) judgment on the misclassification
issue.

Discussion.  1.  Usual course of business.  As the purpose
and operation of § 148B's three prong test[8] have been recently

---

[7] Apparently before receiving that ruling, GateHouse
notified the judge that the Supreme Judicial Court had just
reached a similar conclusion regarding FAAAA preemption of
§ 148B's prong two, in Chambers v. RDI Logistics, Inc., 476
Mass. 95 (2016).

[8] "[A]n individual performing any services, except as
authorized under this chapter, shall be considered to be an
employee . . . unless: --

     "(1) the individual is free from control and direction
in connection with the performance of the service, both
under his contract for the performance of service and in
fact; and

and thoroughly reviewed in <u>Sebago</u> v. <u>Boston Cab Dispatch, Inc.</u>, 471 Mass. 321 (2015) (<u>Sebago</u>), and <u>Chambers</u> v. <u>RDI Logistics, Inc.</u>, 476 Mass. 95 (2016) (<u>Chambers</u>), we proceed directly to the question whether GateHouse has proven under prong two -- as it must to defeat King's claim of employee status -- that King performed newspaper delivery services "outside the usual course of the business" of GateHouse.  G. L. c. 149, § 148B(<u>a</u>)(2), as appearing in St. 2004, c. 193, § 26.  No single test controls this inquiry, so we consider several factors previously held relevant.

a.  <u>Business's self-description</u>.  Essentially the same question arose in <u>Athol Daily News</u>, under the usual course of business portion of the closely-related three-prong employment test of G. L. c. 151A, § 2.  439 Mass. at 175, 178-179.  In addressing that question, albeit briefly, the Supreme Judicial Court observed that the manner in which a business defines itself is relevant to determining its usual course of business. <u>Id</u>. at 179.  "In light of the fact that the News itself defines

---

"(2) the service is performed outside the usual course of the business of the employer; and,

"(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

G. L. c. 149, § 148B(<u>a</u>), as appearing in St. 2004, c. 193, § 26.

its business as 'publishing and distributing' a daily newspaper, we agree that the carriers' services are performed in 'the usual course of [the News's] business.'" Ibid. See Sebago, 471 Mass. at 333 (stating, in a § 148B case, "We have recognized that a purported employer's own definition of its business is indicative of the usual course of that business"); id. at 335 (analyzing how various defendant businesses advertised and otherwise held themselves out).[9]

Gatehouse describes its business as "[n]ewspaper [p]ublishing" in its annual corporate filing with the Secretary of the Commonwealth, and describes itself as a publisher and distributor in its agreements with delivery drivers. This description is notable because, even aside from its use of the term "distribute," GateHouse acknowledges that it is a "publisher," and to "publish" means, among other things, "to place before the public (as through a mass medium); DISSEMINATE." Webster's Third New International Dictionary 1837 (2002). A newspaper publisher not only creates newspaper

---

[9] Of course, this approach must have its limits. A business cannot alter the substance of its usual course of business merely by careful (or careless) self-labeling in its dealings with contractors, employees, customers, or the public. Cf. Sebago, 471 Mass. at 330 (referring to hypothetical business owners "creating a false dichotomy between the administrative and operational aspects of their business"); id. at 335 (wording of defendant entities' advertising, although helpful to plaintiffs' claim of employee status, did "not override the realities of the [entities'] actual business operations").

content but also disseminates it to the public in physical or digital form.

Indeed, an integral part of "publishing" a daily newspaper is making it immediately available to customers and potential customers, because in twenty-four hours or less much of its content will be largely obsolete and of limited, if any, interest to most readers. It is not too much to say that immediate availability to customers is a part of the product GateHouse sells. That GateHouse achieves such immediate availability through a variety of means -- including direct carrier delivery to paper subscribers, bulk distribution by GateHouse employees to stores for resale to the stores' walk-in customers, and via the Internet -- does not make carrier delivery any less a part of GateHouse's business.[10] Rather, it reinforces the point that, one way or another, GateHouse goes to considerable lengths, six days per week, to put the Patriot Ledger quickly into the hands (and onto the screens) of readers.[11]

---

[10] The summary judgment record does not establish what proportion of the Patriot Ledger's circulation is achieved through each of these methods. The most the record shows is that "GateHouse's Massachusetts newspapers reach 1.4 million print readers and 1.2 million monthly unique [online] visitors."

[11] We refer to "customers" and "readers" interchangeably, while noting that in addition to "customers" who purchase a paper or online subscription or a copy at a store, GateHouse benefits from having nonpaying "readers," to the extent that it

Thus, the record shows that GateHouse has a "posted promise in the newspaper to the subscriber" regarding the time by which the newspaper will be delivered, and GateHouse mandated that carriers such as King deliver the newspaper to subscribers by 5 P.M. on weekdays and by 8 A.M. on Saturdays. The agreement required carriers to deliver the newspapers in a dry, readable condition and to the satisfaction of each subscriber. It further provided that if a carrier could not deliver his or her newspapers on a given day, the carrier was required to engage and train a substitute at his or her own expense. If the carrier failed to do so, and GateHouse had to distribute any copy of the newspaper, GateHouse could charge the carrier "liquidated damages" of $2 per weekday copy and $4 per Saturday copy.[12] The agreement did not impose charges for late (as opposed to missed) deliveries, but if a carrier was chronically late in completing his or her route, the Patriot Ledger's home delivery manager stated that GateHouse could consider terminating the agreement with that carrier.

_____

can document them (e.g., through tracking unique online visits). The record shows that GateHouse markets itself to potential advertisers based on the number of people that its publications "reach," through both paid circulation and on the Internet.

[12] GateHouse asserted that there was no evidence it had actually imposed such charges, but that any dispute over that issue was immaterial for summary judgment purposes.

In sum, GateHouse's self-description as a newspaper publisher and distributor, and the manner in which it held itself out to the public and its drivers, support the conclusion that the drivers performed services in the usual course of GateHouse's business.

b.  Necessary vs. incidental services.  "Another factor [in the usual course of business inquiry] is 'whether the service the individual is performing is necessary to the business of the employing unit or merely incidental.'"  Sebago, 471 Mass. at 333 (quotation omitted).  As to this factor, we view it as significant that the Athol Daily News court, in concluding that newspaper carriers furnished services in the usual course of a newspaper publisher's business, gave three other illustrations of services within the usual course of an employer's business: art instructor services performed on a "regular or continuous" basis within an art museum, musicians performing as a "usual and customary" activity at a "beer bar," and an organist playing music as a "usual part of" a funeral home's business.  Athol Daily News, 439 Mass. at 179.[13]  These illustrations indicate that a service need not be the sole, principal, or core product

_____

[13] The court drew these illustrations, respectively, from Mattatuck Museum-Mattatuck Historical Soc. v. Administrator, Unemployment Compensation Act, 238 Conn. 273, 280 (1996); Bigfoot's, Inc. v. Board of Review of the Industrial Commn. of Utah, 710 P.2d 180, 181 (Utah 1985); and Yurs v. Director of Labor, 94 Ill. App. 2d 96, 104 (1968).

that a business offers its customers, or inherently essential to the economic survival of that type of business, in order to be furnished in the usual course of that business.  And the delivery service that GateHouse's drivers furnished to its Patriot Ledger subscribers appears, if anything, to be more necessary than incidental to GateHouse's business.

The Sebago decision further illuminated the distinction between necessary and incidental services by comparing two Illinois decisions, one involving taxi drivers using leased medallions and the other involving drivers of leased limousines. Sebago, 471 Mass. at 333-334, citing Parks Cab Co. v. Annunzio, 412 Ill. 549 (1952) (Parks Cab Co.), and O'Hare-Midway Limousine Serv., Inc. v. Baker, 232 Ill. App. 3d 108 (1992) (O'Hare-Midway).  In Parks Cab Co., "taxicab drivers paid flat fees to lease taxicab medallions"; the medallion owners were "not concerned with the operation of the cabs or the results of their operation" and those owners' "leasing business [was] not directly dependent on the success of the drivers' endeavors." Sebago, 471 Mass. at 333-334.  Indeed, "the drivers rendered no services for" the medallion-leasing businesses.  Id. at 333 (quotation omitted).  In O'Hare-Midway, in contrast, the limousine drivers "picked up customers who had 'booked' limousine services with [the employer]" and "paid a percentage of their commissions to [the employer], thus establishing a

financial interdependence, or a direct financial stake with the limousine company." Sebago, 471 Mass. at 334 (quotation omitted). The limousine drivers, "although they did share a percentage of the commissions, were performing services for O'Hare-Midway (driving customers booked by the limousine service) and not for themselves." O'Hare-Midway, 232 Ill. App. 3d at 112.

GateHouse's delivery drivers are, in several respects, more like the limousine drivers in O'Hare-Midway than the taxi drivers in Parks Cab Co. First, GateHouse takes an active role in securing subscribers for its drivers to service, and for that purpose it deals directly with potential customers. GateHouse employs staff in a sales department that works to increase circulation, as well as district managers who work to retain existing subscribers and to obtain new subscribers in particular territories. Individuals wishing to subscribe to the Patriot Ledger may telephone its call center or send back a card that they were mailed (or had obtained in a store-bought copy) as part of a subscription solicitation. Thus, like the limousine service in O'Hare-Midway, Gatehouse books customers for its drivers.

Although individuals may also arrange subscriptions by dealing directly with a delivery driver, GateHouse is hardly indifferent to such dealings (as were the taxi medallion owners

in Parks Cab Co.), but instead, under the agreement with its drivers, actively encourages them. That agreement requires GateHouse to make free copies of the newspaper available to drivers to "use as samples to drum up more business," and it pays drivers a bounty for each subscription they obtain (in King's case, $20 for an eight-week subscription). If GateHouse acquires a new subscriber within a driver's delivery area, the agreement requires the driver to service that subscriber.

Second, unlike the taxi drivers in Parks Cab Co., the delivery drivers pay no flat fee to GateHouse, but instead pay GateHouse a wholesale price for each Patriot Ledger newspaper they purchase from GateHouse and deliver to a subscriber. The subscriber pays a retail price,[14] plus an optional tip, and the price difference plus any tip is the driver's net profit (or compensation). In substance, like the limousine drivers in O'Hare-Midway, the drivers here pay GateHouse a portion of the revenue they receive from each customer; the more customers they have, the more they pay GateHouse. Moreover, it is only "in some cases" that the subscriber pays the driver; other subscribers pay the retail prices plus tips directly to

---

[14] The agreement assumes that the retail price will be GateHouse's "suggested resale price," elsewhere termed by Gatehouse its "published retail rate." The agreement leaves carriers free to charge less (or more) than that price, although the parties did not agree on whether any carrier had ever done so. That dispute is not material for present purposes.

GateHouse.[15]  And subscribers may provide specific delivery instructions, and complaints about deliveries, directly to GateHouse, which maintains systems for conveying this information to the drivers.[16]

In sum, GateHouse is not merely a wholesaler that takes little interest in whether and how its drivers succeed in reselling newspapers at retail to customers.  Rather, GateHouse deals directly with potential customers in selling subscriptions that include the drivers' delivery services; GateHouse assigns subscribers to delivery territories, deals directly with subscribers in accepting payments, specific delivery instructions, and delivery complaints and conveys those instructions and complaints to the drivers; and GateHouse maintains contractual disincentives to poor delivery service, as well as contractual incentives for expanding delivery service to new customers.

Thus it can fairly be said that the drivers, like the limousine drivers in O'Hare-Midway, perform services on behalf of GateHouse, not merely for their own account.  GateHouse, unlike the taxi medallion owners in Parks Cab Co., is very much

---

[15] GateHouse then applies these amounts as a credit against the wholesale price charged to the driver, and it pays any positive balance to the driver.

[16] Such information may alternatively be conveyed directly from subscriber to driver.

"concerned with the results of the [drivers'] operations"; GateHouse's "business is . . . directly dependent on the success of the drivers' endeavors." Sebago, 471 Mass. at 334. Notably, many features of the publisher-driver-customer relationship set forth above were also present in Athol Daily News, see 439 Mass. at 172-174, and the Sebago court characterized the Athol Daily News case as one where the owner's business was "directly dependent on the drivers' services." Sebago, 471 Mass. at 335.

c. GateHouse's arguments. While acknowledging that it "needs to get its product into the hands of consumers," GateHouse asserts that the same is true of businesses like consumer-electronics manufacturers and online retailers. GateHouse asserts that drivers for the delivery services used by those businesses, such as private delivery companies or the United States Postal Service, cannot be considered those businesses' employees, and thus that newspaper delivery drivers cannot be considered GateHouse employees. But GateHouse has not offered any evidence as to those other businesses' actual operations, including their relationships, if any, with delivery drivers, or the centrality of immediate delivery to the nature of the products they offer.[17] We also recognize that retail

_____

[17] As the Sebago court recognized:

"One may also be engaged in a business that cannot be conducted unless he . . . can ship the finished product to

sales and associated services are in a period of rapid transition, due to technical change and other factors.  We deal only with the case and the evidence presently before us, and we imply no comment on the employment status of workers in any of the industries in GateHouse's examples.

GateHouse's remaining argument is premised on the fact that another of its distribution mechanisms involves wholesaling its newspaper to stores and similar businesses, which then retail the newspaper to individual readers.  Gatehouse argues that to view delivery to readers as occurring in GateHouse's usual course of business would create the "inescapable" yet unreasonable result that "none of these stores can be independent contractors -- even though they are unquestionably independent businesses that fully satisfy the first and third prongs" of § 148B -- and that GateHouse would become the employer of the stores' employees who actually sell the newspapers to customers.  Again, however, GateHouse has not offered any evidence as to those retailers' actual operations.  Nor has it addressed, in a manner rising to the level of

---

the various markets.  It is hard to imagine a business that is not dependent in some way upon transportation.  In such instances, while transportation is a necessity, it does not thereby become a part of or a process in the business but it continues as ancillary and incidental thereto."

Sebago, 471 Mass. at 336, quoting from Cannon v. Crowley, 318 Mass. 373, 376 (1945).

appellate argument, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), how the result it posits is inescapable.[18]

We therefore conclude that the delivery drivers furnish services in the ordinary course of GateHouse's business and accordingly are GateHouse employees under § 148B.

2. Waiver of preemption defense. In denying GateHouse's FAAAA preemption-based motion for relief from judgment -- filed more than two years after the judge ruled that King was a GateHouse employee, and nearly one year after the entry of a rule 54(b) judgment embodying that ruling -- the judge observed that GateHouse had failed to raise the preemption defense in its answer or in a pretrial motion. See Mass.R.Civ.P. 8(c), 365 Mass. 749 (1974) (party's responsive pleading shall set forth any affirmative defense). She then correctly stated that where a Federal statute achieves its preemptive effect not by depriving State courts of subject matter jurisdiction, but instead by altering the law that such courts must apply,

_____

[18] In this connection, GateHouse fails to address "[t]he threshold question" under § 148B: whether putative employees provide services to a particular entity. Sebago, 471 Mass. at 329. If not, they are not that entity's employees, and no analysis of § 148B's three prongs is necessary. See id. at 331-332. Nor does GateHouse address the principle that the usual course of business prong of § 148B "should not be construed to include all aspects of a business such that [the first and third] prongs . . . become unnecessary." Id. at 334-335 (quotation omitted). See Athol Daily News, 439 Mass. at 180. We therefore do not consider these questions.

preemption is a waivable affirmative defense.  See Central
Transp., Inc. v. Package Printing Co., 429 Mass. 189, 191-195
(1999) (Central Transp., Inc.); Ritter v. Massachusetts Cas.
Ins. Co., 439 Mass. 214, 217 (2003) (Ritter).  She rejected
GateHouse's argument that its waiver should have been excused,
premised on GateHouse's assertions that raising a preemption
defense at the time it answered in 2011 or moved for summary
judgment in 2014 would have been futile, and that the governing
law had been changed by the 2016 Federal appellate decisions
underlying GateHouse's motion.

There was no abuse of discretion in these rulings.  The
Federal courts may "excuse a party for failing to raise a
defense only when the defense, if timely asserted, would have
been futile under binding precedent."  Bennett v. Holyoke, 362
F.3d 1, 7 (1st Cir. 2004).  Assuming without deciding that the
Supreme Judicial Court or this court would apply the same
principle in a civil case,[19] GateHouse's argument still fails.
Although, as of 2014, various unreported Federal district court
and Massachusetts trial court decisions had rejected FAAAA
preemption challenges to prong two of § 148B, those decisions
were not "binding precedent."  And as of 2013, both Federal
Express and the Massachusetts Delivery Association were pressing

---

[19] Compare Commonwealth v. Vasquez, 456 Mass. 350, 358-359
(2010); Commonwealth v. Loadholt, 460 Mass. 723, 727 (2011).

the same preemption argument, on which they ultimately succeeded. See Schwann, 813 F.3d at 434 (noting trial court's 2013 preemption decision); Massachusetts Delivery Assn., 821 F.3d at 190 (noting that plaintiff had filed its preemption suit in September, 2010). Thus Gatehouse's assertion of a preemption defense in 2014 would not have been "futile" for excuse-of-waiver purposes.

Next, although a change in governing law may sometimes warrant relief under Mass.R.Civ.P. 60(b)(6), 365 Mass. 829 (1974), see Pielech v. Massasoit Greyhound, Inc., 47 Mass. App. Ct. 322, 326-327 (1999) (amendment of statute), and may apply to cases appealable or on appeal at the time the law is changed, see Lindor v. McDonald's Restaurants of Mass., Inc., 80 Mass. App. Ct. 909, 909-910 (2011) (judicial change of common-law rule), this case involves no such change in law. The FAAAA has had the same meaning since the moment of its enactment in 1994, even if that meaning was not declared in a binding manner for First Circuit and Massachusetts purposes until the Schwann, Massachusetts Delivery Assn., and Chambers[20] decisions in 2016. See generally Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 281 (1986) ("[A]lthough this court has not previously dealt with the issues raised here, we are not announcing common

_____

[20] See note 7, supra.

law rules but rather are construing certain statutory provisions. Those provisions have had the same meaning since the effective date of the statutes"). The judge did not abuse her discretion in rejecting GateHouse's claim that a change in law warranted rule 60(b)(6) relief from GateHouse's waiver.

At oral argument in this appeal, GateHouse raised an argument never made in the trial court or in its appellate briefs: that the FAAAA deprives State courts of subject matter jurisdiction and, accordingly, that FAAAA preemption is a jurisdictional matter that cannot be waived. See Central Transp., Inc., 429 Mass. at 191-195; Ritter, 439 Mass. at 217. GateHouse bases its argument on language in the FAAAA prohibiting a State from "enact[ing] or enforc[ing] a law" related to a price, route, or service of a motor carrier with respect to the transportation of property (emphasis added). 49 U.S.C. § 14501(c)(1) (2012).[21] In GateHouse's view, the prohibition on enforcement deprives State courts of subject matter jurisdiction. GateHouse has not addressed the fact that

_____

[21] The relevant portion of the FAAAA, codified at 49 U.S.C. § 14501(c)(1), provides as follows:

"Except as provided in paragraphs (2) and (3), a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."

this prohibition by its terms applies "[e]xcept as provided in paragraphs (2) and (3)" of section 14501(c), suggesting that States (including State courts) are not ousted of all enforcement authority in this area. See Chambers, 476 Mass. at 108 n.16. Regardless, as the parties have not briefed whether FAAAA preemption is jurisdictional, and as further proceedings will be required in the trial court on, among other things, relief for the class members, we do not resolve the issue. GateHouse may assert its argument that the point is jurisdictional, which under Mass.R.Civ.P. 12(h)(3), 365 Mass. 754 (1974), must be considered by the court whenever raised, during those further proceedings.

Conclusion. The judgment entered November 12, 2015, is affirmed. The order entered December 19, 2016, denying GateHouse's motion for relief from judgment is affirmed.

So ordered.