SUPREME JUDICIAL COURT 
 
 DHANANJAY PATEL[1] & others[2] vs. 7-ELEVEN, INC.; DP MILK STREET INC. & others,[3] third-party defendants

 
 Docket:
 SJC-13485
 
 
 Dates:
 April 1, 2024 - September 5, 2024
 
 
 Present:
 Suffolk
 
 
 County:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 

 
 Keywords:
 Independent Contractor Act. Massachusetts Wage Act. Contract, Franchise agreement. Statute, Construction
 
 

             Certification of a question of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.
            Shannon Liss-Riordan (Matthew Carrieri also present) for the plaintiffs.
            David C. Kravitz, Deputy State Solicitor, for the Attorney General.
            Norman M. Leon, of Illinois (Matthew J. Iverson also present) for 7-Eleven, Inc.
            The following submitted briefs for amici curiae:
            Benjamin G. Barokh, of California, & Elaine J. Goldenberg for Chamber of Commerce of the United States of America.
            Catherine M. Scott for Massachusetts Defense
Lawyers Association, Inc.
            Jason Salgado & Ana Muñoz for Massachusetts Employment Lawyers Association & others.
            David Oppenheim, Aaron Van Nostrand, & Jaclyn DeMais, of New Jersey, & Jeffrey Greene for International Franchise Association.
            WENDLANDT, J.  This case presents the second certified question from the United States Court of Appeals for the First Circuit (First Circuit or certifying court) in the continuing saga to determine whether the five plaintiffs -- Dhananjay Patel, Safdar Hussain, Vatsal Chokshi, Dhaval Patel, and Niral Patel -- were misclassified as independent contractors by the defendant franchisor -- 7-Eleven, Inc. (7-Eleven) -- in violation of, inter alia, G. L. c. 149, § 148B (independent contractor statute).[4]  In the first round, the First Circuit certified the question 
"[w]hether the three-prong test for independent contractor status set forth in [the independent contractor statute] applies to the relationship between a franchisor and its franchisee, where the franchisor must also comply with the [Federal Trade Commission (FTC)] Franchise Rule."[5]
Patel v. 7-Eleven, Inc., 489 Mass. 356, 357 (2022) (Patel I).  
            We concluded that, where a franchisee is an "individual performing any service" for a franchisor, G. L. c. 149, § 148B, the three-prong test set forth in the independent contractor statute, see discussion infra, applies to the relationship between a franchisor and the individual; and we determined that the test does not conflict with the franchisor's disclosure obligations prescribed by the FTC Franchise Rule.  See Patel I, 489 Mass. at 357.  In response to the First Circuit's invitation for more guidance, we noted that the classification question under the independent contractor statute requires examination of the facts of each case, which begins with a threshold determination whether the putative employee "perform[s] any service" for the alleged employer.  Id. at 370, quoting G. L. c. 149, § 148B.  
            In this second round, the First Circuit has certified a question related to the threshold determination of the independent contractor statute.  Specifically, the court has certified the question:
"Do [the plaintiffs] 'perform[] any service' for 7-Eleven within the meaning of [the independent contractor statute], where, as here, they perform various contractual obligations under the Franchise Agreement and 7-Eleven receives a percentage of the franchise's gross profits?"
Patel v. 7-Eleven, Inc., 81 F.4th 73, 76 (1st Cir. 2023).
            Our analysis of the certified question is informed by the fact that, rather than operate their convenience stores under their own name and goodwill, the franchisees -- two of the plaintiffs individually and three of the plaintiffs through the corporate entities they own -- licensed the right to use the 7-Eleven branded method of operating a convenience store (business format franchise), having determined that purchasing the 7-Eleven brand, know-how, and goodwill made more financial sense for their businesses.  In exchange, the franchisees agreed to various contractual obligations requiring them to operate their convenience stores so as to maintain the integrity of the 7-Eleven business format franchise, and they agreed to pay a franchise fee.  In short, the franchisees cloaked their otherwise independent businesses in the 7-Eleven brand, paid 7-Eleven for that benefit, and agreed not to dilute the brand they had purchased.  
            Because "[t]he purpose of the independent contractor statute is 'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees,'" Depianti v. Jan–Pro Franchising Int'l, Inc., 465 Mass. 607, 620 (2013), quoting Taylor v. Eastern Connection Operating, Inc., 465 Mass. 191, 198 (2013), and because the circumstances of this case, which generally are typical of franchise relationships, do not indicate that the plaintiffs are in fact employees, those circumstances do not satisfy the threshold inquiry.  Instead, the circumstances here indicate that the franchisees operate independent stores not for 7-Eleven but rather for themselves.  Accordingly, we answer the certified question "no."[6]
            1.  Background.  We recite the facts as stated by the certifying court and based on the record before us, reserving some details for later discussion.  Awuah v. Coverall N. Am., Inc., 460 Mass. 484, 488 (2011).  The franchisees own and operate convenience stores in the Commonwealth.[7]  Patel, 81 F.4th at 73.  They each entered into a franchise agreement with 7-Eleven.[8]  Id.
            Pursuant to these agreements, 7-Eleven provided to each franchisee a license to use its business format franchise.  Specifically, 7-Eleven provided a license to use 7-Eleven's trade name, trade dress, trade secrets, service marks, and proprietary products in connection with the operation of a convenience store at a specified location leased to the franchisee by 7-Eleven; 7-Eleven also provided the franchisees certain services and resources,[9] including training, equipment, advertising, and operational know-how.  
            In consideration for the license, the franchisees agreed to operate their businesses in conformity with certain contractual obligations designed to maintain the integrity of the 7-Eleven business format franchise.  The agreements stated, 
"By signing this Agreement . . . [y]ou recognize that a uniform presentation of a high-quality 7-Eleven Image is critical to the customer's perception of the 7-Eleven System[, see note 9, supra], and that you agree to contribute to that perception by operating your Store in compliance with this Agreement and the 7-Eleven System."
            The franchisees also agreed to "participat[e] in required training, man[] their convenience stores 24 hours per day in 7-Eleven-approved uniforms, [and] buy[] particular inventory from particular vendors."  Patel, 81 F.4th at 74.  The franchisees were required to stock a reasonable and representative quantity of 7-Eleven's proprietary products, to carry only those products consistent with 7-Eleven's image, to sell certain products in special packaging or display cases, to comply with 7-Eleven's food service standards, and to maintain the retail stores in a clean and attractive condition.[10]  
            In addition, the franchisees agreed to pay an initial franchise fee, as well as a recurring "7-Eleven Charge"[11] equivalent to approximately fifty percent of the convenience store's gross profits.[12]  See Patel, 81 F.4th at 74.  The agreements provided that the 7-Eleven Charge was for "the License, the Lease [for the property on which the convenience store was located],[13] and [7-Eleven's] continuing services."
            2.  Discussion.  As the remedial nature and purpose of the independent contractor statute were reviewed recently in Patel I, 489 Mass. at 358-361, we need not repeat that discussion at length.  Briefly, "[t]he purpose of the independent contractor statute is 'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees.'"  Depianti, 465 Mass. at 620, quoting Taylor, 465 Mass. at 198.  
            To that end, the independent contractor statute establishes that "'an individual performing any service' is presumed to be an employee."  Depianti, 465 Mass. at 621, quoting G. L. c. 149, § 148B (a).  The putative employer may rebut this presumption by establishing by a preponderance of the evidence each of the three prongs of the so-called "ABC test":
"(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
"(2) the service is performed outside the usual course of the business of the employer; and,
"(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."
G. L. c. 149, § 148B (a).  "The failure to satisfy any prong will result in the individual's classification as an employee."  Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 327 (2015).       a.  Meaning of "performing any service."  The certified question concerns the threshold determination whether the individual "perform[s] any service" for the putative employer.  G. L. c. 149, § 148B (a).  "In construing a statute, we begin with its plain language."  Matter of the Estate of Mason, 493 Mass. 148, 151 (2023), citing Metcalf v. BSC Group, Inc., 492 Mass. 676, 681 (2023).  
"[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated."
Matter of the Estate of Mason, supra, quoting Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006).  By its plain language, the phrase "performing any service" in the wage and employment context captures carrying out any labor in the interest, or under the direction, of the putative employer, usually (but not always) for remuneration.[14]  See, e.g., Depianti, 465 Mass. at 625 (Cordy, J., dissenting in part) ("whether a defendant may be liable for employee misclassification under [the independent contractor statute] depends first and foremost on whether there is a work arrangement of some type between the defendant and the person claiming misclassification").
            This construction supports the broad, remedial purpose of the independent contractor statute, which we have previously stated is entitled to a "liberal construction."  Sebago, 471 Mass. at 328, quoting Depianti, 465 Mass. at 620.  See Patel I, 489 Mass. at 363, quoting Monell v. Boston Pads, LLC, 471 Mass. 566, 575 (2015) ("a remedial statute . . . should be given a broad interpretation . . . in light of its purpose . . . to promote the accomplishment of its beneficent design").  
            b.  Franchise relationship.  While the meaning of "performing any service" is readily derived, whether the threshold determination is satisfied will depend on the facts of each case, and its application in the context of franchise relationships presents a heightened challenge.  See Sebago, 471 Mass. at 329-330.  Indeed, as the plaintiffs assert, there is little case law applying the threshold determination at all; most of our cases address the ABC test directly without express analysis of the question whether the individual "perform[s] any service" for the putative employer.  See, e.g., Coverall N. Am., Inc. v. Commissioner of the Div. of Unemployment Assistance, 447 Mass. 852, 854 (2006) (Coverall) (in connection with analysis pursuant to unemployment insurance statute, G. L. c. 151A, § 2, assuming janitor franchisee performed services for cleaning company franchisor where franchisee provided cleaning services to franchisor's clients); Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 173 (2003) (same for carriers who purchased newspapers wholesale from newspaper company and delivered papers to company's customers).[15]  
            Moreover, we have previously acknowledged the difficulty of applying laws targeted to the usual employment relationship in the context of the typical franchise relationship.  See Depianti, 465 Mass. at 615, citing Kerl v. Dennis Rasmussen, Inc., 2004 WI 86, ¶ 31 (discussing difficulty of applying traditional "right to control" test for determining vicarious liability of franchisor).  The reason for this difficulty is rooted in the character of a franchise relationship and its intersection with Federal law.  
            Specifically, "[a] franchise is a business format typically characterized by the franchisee's operation of an independent business pursuant to a license to use the franchisor's" intellectual property, such as its service mark, trademark, trade dress, or trade name (emphasis added).  Kerl, 2004 WI 86, ¶ 5.  Thus, rather than operate a store under their own name or developing their own goodwill with the consuming public, franchisees choose to operate their stores using the franchisor's brand, presumably having concluded that the benefits of doing so outweigh the franchise fee and other conditions associated with the brand's use.  Id. ¶ 28.
            In exchange for the right to use the franchisor's brand, the franchisee usually agrees to certain conditions governing its use.  Id. ¶¶ 32-33.  These conditions are designed "to protect the integrity of the [licensed brand] by setting uniform quality, marketing, and operational standards applicable to the franchise."  Id. ¶ 5.  Policing the use of the brand, through quality, marketing, and operational standards, is necessary to maintaining its value and continued primary function as a beacon to consumers indicating the source of particular goods or the quality of a particular store.  See Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959) (absent policing, "the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities").  
            Significantly, a franchisor's failure to control and supervise the use of its brand can result in dilution of the brand and eventually a determination that the brand has been abandoned under Federal law.  See Depianti, 465 Mass. at 615, citing 15 U.S.C. § 1064(5)(A) ("a franchisor is required to maintain control and supervision over a franchisee's use of its mark, or else the franchisor will be deemed to have abandoned its mark under the abandonment provisions of the Lanham Act").  See also Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1519 (11th Cir. 1992) (Lanham Act's abandonment provision "imposes a duty upon a licensor [such as a franchisor] to supervise a licensee's use of the licensor's own trademark").  Accordingly, we have observed that traditional tests for determining employment-based responsibilities are "'not easily transferable'" to the usual franchise relationship because strict application "could have the undesirable effect of penalizing franchisors for complying with Federal law."  Depianti, 465 Mass. at 615-616, quoting Kerl, 2004 WI 86, ¶ 31.  
            Despite the dearth of case law, and the aforementioned difficulties of applying employment laws in the franchise context, a few principles emerge from our jurisprudence that guide our analysis.[16]  
            c.  Labels.  To begin, we have stated repeatedly that the threshold determination of whether an individual is performing any service for a putative employer is not governed by the label -- such as "franchisee" -- used by the parties to characterize their relationship.  See Sebago, 471 Mass. at 329 ("the parties' characterization of their relationship . . . is not controlling"); Depianti, 465 Mass. at 622, quoting DiFiore v. American Airlines, Inc., 454 Mass. 486, 497 (2009) ("the Legislature 'was cognizant, in general, of the risk that employers or other persons may seek to find ways, through special contracts or other means, to attempt to avoid compliance . . . and intended to thwart such schemes'").  Thus, a franchisor cannot avoid its responsibilities under the wage laws merely by contracting with a franchisee to refer to their relationship as a "franchise," or to the franchisee as an "independent contractor."  See G. L. c. 149, § 148 ("No person shall by a special contract with an employee or by any other means exempt himself from" obligation to pay employee wages).    
            For instance, in Coverall, 447 Mass. at 853, we concluded that a janitor should have been classified as an employee of the franchisor, a company that sold "franchises specializing in commercial janitorial cleaning businesses," even though the franchisor entered into a franchise agreement with the janitor.  Unlike the typical franchise relationship described supra, pursuant to which the franchisee operates its own independent business using the franchisor's brand, the record in Coverall showed that the janitor provided the janitorial labor for the franchisor's customer accounts and was paid by the franchisor for doing so.  Id. at 853-854, 859.  
            Here, the fact that the franchisees and 7-Eleven label the relationship at issue a "franchise" in their agreements does not govern whether the plaintiffs perform any service for 7-Eleven.  See Sebago, 471 Mass. at 329.  However, it is significant that, unlike the janitor in Coverall, the plaintiffs do not perform any labor for 7-Eleven customer accounts.  See Awuah v. Coverall N. Am., Inc., 707 F. Supp. 2d 80, 82, 85 (D. Mass. 2010) (janitor who performed labor for franchisor's customers and received payment from franchisor was franchisor's employee).  Instead, the customers of the franchisees consist of the general public.  Cf. Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 811 (2018) (delivery driver, who delivered newspapers to newspaper publisher's subscribers, was employee of newspaper publisher).  
            d.  Services provided by putative employer.  Next, the Attorney General, as amicus, correctly asserts that, under our case law, the threshold determination does not center on the services the putative employer might provide for the individual.  See G. L. c. 149, § 148B (a) ("an individual performing any service" for putative employer is presumptively "employee").[17]  See also Coverall, 447 Mass. at 853-854 (concluding that janitor franchisee was cleaning company franchisor's employee even though franchisor provided training program, cleaning techniques, management techniques, and initial customer base to franchisee); Awuah, 707 F. Supp. 2d at 81 (same where franchisor provided "methods, procedures, standards, and equipment for janitorial cleaning"; "procedures for quality control and customer assistance; marketing concepts; bidding, contracting, and billing procedures; [and] training, assistance, advertising, and promotional programs" to franchisees).  
            Accordingly, the fact that 7-Eleven provides a license, a leasehold, and ongoing support or other services to the franchisees is not dispositive of the threshold determination.  As is clear from the statute's plain language, the threshold determination focuses on the question whether the individual performs a service for the putative employer; it does not focus on services performed by the putative employer for the individual.  See G. L. c. 149, § 148B.
            This does not mean, however, that the character of the parties' franchise relationship is irrelevant to the threshold determination.  It is significant, here, for example, that the franchisees, rather than opening a retail store under their own name and goodwill, chose to purchase the right to use the 7-Eleven branded business format franchise and to operate their convenience stores using the goodwill and associated market power of that intellectual property.[18]   As discussed in further detail infra, this business decision by the franchisees informs whether "the circumstances indicate that they are, in fact, employees," such that classification of them as employees serves the purpose of the independent contractor statute.  Depianti, 465 Mass. at 620, quoting Taylor, 465 Mass. at 198.
            e.  Revenue received by putative employer.  Our case law also demonstrates that the threshold determination is not satisfied simply because a putative employer derives revenue from the sales of its products or services to the individual who is claiming to be an employee.  This is true regardless of whether the revenue derived by the putative employer from such sales is a fixed fee or an ongoing, percentage-based royalty payment.  
            Our decision in Sebago is instructive.  There, we examined taxicab drivers' contention that they were employees of the medallion owners from whom they leased both their taxicab licenses (medallions)[19] and the taxicabs that they drove.  Sebago, 471 Mass. at 329-331.  The drivers paid the owners to lease the medallions and the taxicabs.  Id. at 325.  Reasoning that the business of the medallion owners was leasing medallions and taxicabs, and in that business the drivers rendered no services, we concluded that the drivers' lease payments to the medallion owners for the lease of the medallions and taxicabs, although revenue for the medallion owners, did not satisfy the threshold determination.  Sebago, 471 Mass. at 330-331, citing Parks Cab Co. v. Annunzio, 412 Ill. 549, 553 (1952).  See Sebago, supra at 325, 331-332 (drivers not presumptive employees of garage owners even though garage owners' "revenues derive largely from" relationship with drivers because revenue was not related to any labor that drivers performed for garage owners and instead was payment by drivers for repair work done by owners).
            Contrary to the Attorney General's contention, the threshold determination also does not turn on whether the putative employer charges a flat fee for its wares as opposed to an ongoing, percentage-based royalty.  The Attorney General's position appears to be based on a misapprehension of our treatment in Sebago of another group of putative employers -- namely, radio associations that made dispatch calls to the drivers, requesting transportation on behalf of the associations' corporate customers.  Sebago, 471 Mass. at 324, 331.  When a driver chose to provide the desired transportation, the associations' customers remitted a voucher, provided by the radio associations, to the drivers.  Id. at 331.  In turn, the associations redeemed the voucher, by paying the drivers "an amount equal to the fare and tip, minus a 'processing' fee."  Id.  These facts, we determined, showed that the drivers performed a service for the radio associations.  Id.
            In doing so, we stated that "[t]he revenue flowing to the radio association through the voucher program is directly dependent on the drivers' work of transporting passengers."   Id.  We did not suggest that the fact that the associations' processing fee was a percentage of the fare earned by the driver, as opposed to a flat fee, was dispositive.  Instead, the salient facts upon which we relied in making the threshold determination were that the drivers did the work of driving the associations' clients and in turn were paid therefor by the associations.  See id.  
            We decline to adopt a construction, urged by the Attorney General and the plaintiffs, that would have the threshold determination turn on whether the parties to a franchise relationship choose to structure the fee for the use of the franchisor's brand as a flat fee or an ongoing, percentage-based royalty payment.  See Patel I, 489 Mass. at 370 (threshold determination "not satisfied merely because a relationship between the parties benefits their mutual economic interests"). 
            f.  Paid and unpaid labor.  As the foregoing analysis shows, our case law sets forth that "performing any service" requires labor performed in the interest or under the direction of the putative employer, whether paid or unpaid.  See Sebago, 471 Mass. at 331 (associations paid drivers to perform labor for associations' customers); Coverall, 447 Mass. at 853-854 (applying ABC test where individual was paid monthly by putative employer for services provided to putative employer's customer).
            Based on the record, it appears that for approximately ten percent of the 7-Eleven branded convenience stores, 7-Eleven owns the stores and pays its employees -- store managers -- to operate the stores in accordance with its quality, marketing, and operational standards.  For the remaining 7-Eleven branded convenience stores, like the ones operated by the franchisees here, the stores instead are owned by the franchisees and it appears that 7-Eleven does not pay the franchisees at all.  
            To be sure, as the plaintiffs contend, the franchise agreements provide that, subject to a minimum balance requirement and after 7-Eleven is paid its percentage-based franchise fee, 7-Eleven will pay the franchisee, at the franchisee's election, "the remaining gross profits as . . . [a] draw" from the 7-Eleven controlled bank account.[20]  Patel, 81 F.4th at 74.  Such a withdrawal, however, is not a payment by 7-Eleven for labor performed by the plaintiffs any more than a withdrawal from a personal banking account is a salary paid by a bank to the bank patron.
            This does not end our analysis; as is clear from the plain language of "performing any service," in the present context,  receipt of remuneration from the putative employer is only the usual case.  See discussion supra.  Consistent with the remedial nature of the independent contractor statute, we have concluded that, even where the individual is not paid by the putative employer, the threshold determination can be satisfied where the individual carries out labor that renders more attractive the putative employer's products to the employer's customers.[21]  See, e.g., Sebago, 471 Mass. at 331, 334 (threshold determination satisfied by drivers' work of driving taxicabs, which increased value of advertisement space on taxicabs, which in turn was sold by medallion owners to its customers); id. at 330 n.9 (citing cases concluding that adult entertainment dancers, paid by customer tips and not by putative employer, performed service for bar owners where dancers enhanced entertainment marketed by owners, allowing them to sell more alcohol to bar patrons); Jenks vs. D. & B. Corp., Mass. Super. Ct., No. 09–1978, slip op. at 7 (Essex County Aug. 24, 2011), quoting Chaves vs. King Arthur's Lounge, Inc., Mass. Super. Ct., No. 07–2505 (Suffolk County July 30, 2009) (adult dancers paid only through customer tips were nevertheless club's employees because they contributed to "adult entertainment portfolio" offered to club's customers, which consisted of "the sale of alcohol and the exotic dancing, together and intertwined").  
            Here, the franchisees must operate their stores in compliance with obligations that maintain and enhance the value of 7-Eleven's business format franchise.  See Sebago, 471 Mass. at 331.  In turn, 7-Eleven can sell more licenses of its business format -– including, inter alia, 7-Eleven's trade name, trade dress, trade secrets, service marks, and proprietary products –- to other franchisees.  As 7-Eleven's economics expert on franchising averred, 
"In the context of franchising, brand equity can suffer if either the franchisor or a sufficient number of franchisees shirk their responsibilities such that the product's quality or customer experience slips, and customers cease to value the brand as much as they did before.  Accordingly, part of the value that a franchisee purchases when it enters into a franchise agreement is the franchisor's commitment to expend money and effort maintaining and enhancing the brand's value over the life of that franchise agreement.  This commitment typically includes efforts by the franchisor to advertise the brand, police the franchise system, enforce quality standards across all franchisees, and spend monies for brand development and system quality control."  (Footnote omitted.)
            If, as contended by the plaintiffs, operating the convenience stores in compliance with these obligations were considered "performing any service," all typical franchise relationships would be presumptive employment relationships.[22]  We reject such an unreasonable construction.  See Sebago, 471 Mass. at 329, quoting DiFiore, 454 Mass. at 490-491 ("[O]ur respect for the Legislature's considered judgment dictates that we interpret the statute to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation").  
            Such a sweeping classification of independent owners of franchises as presumptive employees of their franchisors does not further the "main object to be accomplished" of the independent contractor statute:  "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees" (emphasis added).  Depianti, 465 Mass. at 620, quoting Taylor, 465 Mass. at 198.  After all, a franchise is usually a business that is independent from the franchisor.  See Kerl, 2004 WI 86, ¶¶ 5, 28.  Here, the franchisees, rather than operate a convenience store under their own name and goodwill, purchased the right to operate their stores using the 7-Eleven business format franchise -- a form of intellectual property that included the 7-Eleven service mark, trademark, trade dress, proprietary products, and other know-how that define and distinguish a 7-Eleven store from other retailers.  As a condition to the right to use the 7-Eleven business format franchise, the franchisees agreed to operate their stores in compliance with certain quality, marketing, and operational standards set by 7-Eleven.  Ensuring that franchisees follow these standards is critical to the continued ability of the 7-Eleven brand to serve as a sign to consumers of the type of store and the quality of products and services available therein.  See Dawn Donut Co., 267 F.2d at 367.
            Admittedly, Federal law sets forth a general standard to avoid abandonment of a brand; it does not dictate the specific steps required to maintain a brand's integrity.  Compare 15 U.S.C. § 1064(5)(A) (abandonment occurs when licensor "does not control, or is not able legitimately to exercise control over, the use of [its] mark"), with Sebago, 471 Mass. at 330 (describing detailed, comprehensive regulatory scheme governing taxicab industry).  It is significant, however, that under Federal law, the failure to police the use of the 7-Eleven brand could result in dilution of the brand; at the extreme, lack of supervision and control over the brand's use could result in the conclusion that 7-Eleven has abandoned its intellectual property.  See Depianti, 465 Mass. at 615, citing 15 U.S.C. § 1064(5)(A).  
            Accordingly, we conclude that the contractual obligations of the franchisees to operate their convenience stores in a manner that preserves the integrity of the brand does not satisfy the threshold determination.  As the Attorney General has previously recognized, "there are legitimate independent contractors and business-to-business relationships in the Commonwealth.  These business relationships are important to the economic wellbeing of the Commonwealth and, provided that they are legitimate and fulfill their legal requirements, they will not be adversely impacted by enforcement of the [independent contractor statute]."  Patel I, 489 Mass. at 370, quoting Advisory 2008/1, Attorney General's fair labor and business division, at 5.  The franchise relationship at issue here is one such business-to-business relationship in which the franchisees have chosen to operate their independent businesses using the 7-Eleven business format franchise, to pay 7-Eleven for that use, and to abide by conditions that maintain the integrity of the 7-Eleven brand consistent with the requirements of Federal law.  These circumstances do not "indicate that [the plaintiffs] are, in fact, employees" of 7-Eleven, Depianti, 465 Mass. at 620, quoting Taylor, 465 Mass. at 198, and thus do not satisfy the threshold determination.  
            Accordingly, we answer the certified question "no."  The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court.  The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States Court of Appeals for the First Circuit, as the answer to the question certified, and will also transmit a copy to each party.
 
footnotes

 
            [1] Individually and on behalf of all others similarly situated.
            [2] Safdar Hussain, Vatsal Chokshi, Dhaval Patel, and Niral Patel, individually and on behalf of all others similarly situated.
            [3] DPNEWT01, Inc.; DP Tremont Street Inc.; and DP Jersey Inc.
            [4] Pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), 
"[t]his court may answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."
            [5] The FTC "promulgated a series of regulations regarding franchises, 16 C.F.R. §§ 436.1 et seq., to which the certifying court referred collectively as the 'FTC Franchise Rule.'"  Patel v. 7-Eleven, Inc., 489 Mass. 356, 357 n.6 (2022) (Patel I).
           [6] We acknowledge the amicus briefs submitted by the Attorney General; the Chamber of Commerce of the United States of America; the Massachusetts Defense Lawyers Association, Inc.; the Massachusetts Employment Lawyers Association, Inc., and Massachusetts Worker Centers; and the International Franchise Association.
            [7] Two of the plaintiffs, Dhananjay Patel and Safdar Hussain, entered into their franchise agreements as individuals.  The three remaining plaintiffs, Dhaval Patel, Niral Patel, and Vatsal Chokshi, entered into their agreements on behalf of separate corporate entities.  We do not decide what, if any, effect the fact that these latter three plaintiffs used corporate entities to enter into the franchise agreements with 7-Eleven has on the question whether they are "individuals" who perform services under the independent contractor statute.  See G. L. c. 149, § 148B (a) ("an individual performing any service" [emphasis added]); Chambers v. RDI Logistics, Inc., 476 Mass. 95, 109 (2016) (discussing whether plaintiffs were "individuals who provide services" based on "nonexhaustive list of factors [about] whether the worker's use of the corporate form was at the worker's behest or forced upon the worker by an employer in order to misclassify" worker).  
            [8] The franchise agreements are materially the same between each franchisee and 7-Eleven.  Patel, 81 F.4th at 73.
           [9] Specifically, 7-Eleven provided access to the "7-Eleven System," a
"system for the fixturization, equipping (including the development and use of computer information systems hardware and software), layout, merchandising, promotion (sometimes through products or services consisting of, including or identified by trademarks, service marks, trade names, trade dress symbols, other trade indicia, copyrightable works, including advertising owned or licensed by [7-Eleven]), and operation of extended-hour retail stores operated by [7-Eleven] or [its] franchisees."
            [10] The franchisees also agreed to follow internal bookkeeping and financial procedures established by 7-Eleven, such as "using a designated system for payroll."  Patel, 81 F.4th at 74.
            [11] Pursuant to the agreements, 7-Eleven agreed to "establish[] and maintain[] a bank account, where the store's gross profits [would be] held and from which the 7-Eleven Charge [was to be] paid."  Patel, 81 F.4th at 74.  
            [12] The franchisees also paid an additional initial down payment to 7-Eleven for administrative expenses incurred by 7-Eleven in granting the franchise.
            [13] 7-Eleven "lease[d] the Store . . . to [the franchisee] solely for the operation of a franchised 7-Eleven Store pursuant to th[e] Agreement and in accordance with the 7-Eleven System."
            [14] The word "perform" means to "carry out or bring about" or to "accomplish."  Webster's Third New International Dictionary 1678 (2002).  "[T]he word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind," signaling the breadth of the services the Legislature intended to cover (quotation and citation omitted).  Department of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 131 (2002).  As it pertains to the wage and employment context, the term "service" is defined as "[l]abor performed in the interest or under the direction of others . . . usu[ally] for a fee."  Black's Law Dictionary 1643 (11th ed. 2019).
            [15] "Massachusetts case law interpreting [G. L. c. 151A, § 2,] provides a useful guide to interpreting [the independent contractor statute]."  Advisory 2008/1, Attorney General's fair labor and business division, at 3.  See also Tiger Home Inspection, Inc. v. Director of the Dep't of Unemployment Assistance, 101 Mass. App. Ct. 373, 378 n.7 (2022) ("[G. L. c. 151A and the independent contractor statute] define employment in terms similar enough that analysis under one provision is instructive as to the other").
            [16] The plaintiffs ask us to adopt their understanding of the approach to the threshold determination adopted by some courts in California.  The cited cases, however, do not address the question with which we are faced here.  See Mejia v. Roussos Constr., Inc., 76 Cal. App. 5th 811, 817-819 (2022) (addressing whether California's ABC test requires first showing that defendant was "hiring entity," that is, "[a]n entity . . . involved in a worker's hiring"); People v. Uber Techs., Inc., 56 Cal. App. 5th 266, 288 (2020) (rejecting defendant's contention that court "must first decide whether [plaintiffs'] services are rendered to [customers], or to [defendants]" before applying ABC test).
            [17] While the independent contractor statute does not expressly specify that the services must be performed for the putative employer, it is clear from the context that the relevant labor must be carried out for the employer.  See Sebago, 471 Mass. at 329 ("The threshold question is whether the plaintiffs provided services to the [putative employer]").
            [18] As discussed supra, unlike the janitor franchisee in Coverall, the plaintiff franchisees do not carry on labor for the franchisor's customers.  See Coverall, 447 Mass. at 853-854, 859.  Nor do they get paid by 7-Eleven for any labor they perform.  See part 2.f, infra.
            [19] Under the highly regulated scheme imposed by the police commissioner of Boston, a medallion was a license issued by the city to engage in taxicab services.  Sebago, 471 Mass. at 323.
            [20] The contractual provision establishing a 7-Eleven controlled bank account for the deposit of store revenues, see note 11, supra, does not appear to be designed to maintain the integrity of 7-Eleven's business format franchise.  Thus, it is unlike the franchisees' other contractual obligations such as, inter alia, to maintain store hours, to wear uniforms, to attend trainings and train employees, to carry proprietary products, to pay an advertisement fee, and to buy inventory from approved vendors.  Because the account is established by 7-Eleven and appears to be an expedient to ensure payment of the franchise fee to 7-Eleven, we do not consider it a "service" –- i.e., labor -- performed by the plaintiffs.
            [21] By contrast, other States limit their labor protections to individuals who receive remuneration from the putative employer.  See Del. Code Ann. tit. 19, § 3302(10)(K) (ABC test applies when "services [are] performed by an individual for wages"); Ind. Code § 22-4-8-1(b) (ABC test applies when "[s]ervices [are] performed . . . for remuneration"); Neb. Rev. Stat. § 48-604(5) ("Services performed by an individual for wages . . . shall be deemed to be employment . . ."); Nev. Rev. Stat. § 612.085 (same); N.H. Rev. Stat. Ann. § 282-A:9(III) (same); N.M. Stat. Ann. § 51-1-42(F)(5) (ABC test applies when services are performed "for wages or other remuneration"); Vt. Stat. Ann. tit. 21, § 1301(6)(B) ("Services performed by an individual for wages shall be deemed to be employment . . ."); Wash. Rev. Code § 50.04.140 ("Services performed by an individual for remuneration shall be deemed to be employment . . .").
             [22] This is because, as described supra, the franchisees, rather than operating their stores under their own goodwill, choose to operate their stores with the benefit of the franchisor's brand and in turn promise to use the licensed brand consistent with standards designed to maintain it as a beacon of quality.  This arrangement characterizes the typical franchise relationship.